**D.G.R.; and T.B.H., Appellants,**

v.

**COMMONWEALTH of Kentucky, CABINET FOR HEALTH AND FAMILY SERVICES, Appellee.**

No. 2010–SC–000100–DGE.

Supreme Court of Kentucky.

April 26, 2012.

Jill Lyn Giordano, Jennifer Sacharnoski Nelson, Princeton, KY, for appellants.

Dilissa Gaye Milburn, Assistant Counsel, Cabinet for Health and Family Services, Office of Legal Services, Mayfield, KY, for appellee.

Opinion of the Court by Justice NOBLE.

This termination of parental rights case was accepted for review to address whether the Court of Appeals erred in reversing the trial court's order denying the Cabinet's petition to terminate parental rights. The Court of Appeals held that the trial court's findings of fact were clearly erroneous and that evidence in this case overwhelmingly supported termination. Upon review of the record, this Court finds that the trial court's findings of fact were supported by substantial evidence and thus were not clearly erroneous. Therefore, the judgment of the Court of Appeals is reversed, and the judgment of the trial court is reinstated.

## I. Background

The facts in this case are most notable because the hearing testimony from each side presents a starkly different picture of the parents and the home environment provided for the child for whom the Cabinet sought parental termination. As with most cases that result in termination proceedings, the case history is long.

Appellants D.G.R. (mother) and T.B.H. (father) are the natural parents of A.H. (child), who was born on January 27, 1997. Although mother and father are not married, they had lived together for over twelve years. The child lived in the home with both parents until his removal in 2004. He is autistic and has also been diagnosed as suffering from attention deficit hyperactivity disorder and possibly from bipolar disorder. Witnesses from

both sides recognized that the child is difficult and prone to aggressive behavior and frequent outbursts. Moreover, because of the child's severe developmental delays, his communication skills are extremely limited.

In October of 2004, the Cabinet for Health and Family Services investigated a report of physical abuse. The child was observed to have raised red welts on his buttocks and upper thighs, and marks on his chest, leg, face, and back. He was seven years old at the time, but was unable to communicate how he sustained the injuries. Social workers testified that he was wearing a urine-soaked pull-up diaper that was too small for his size, and his pajamas were also urine-soaked, as were his bed linens.

As a result of the investigation, an abuse petition was filed, and the child was removed from the home and committed to the custody of the Cabinet. Subsequently, he was placed in a foster home, and mother and father were permitted supervised visits with him. The Cabinet established a case plan for the parents, which included parenting classes, attending support group meetings for parents of autistic children, and the parents' agreement not to use corporal punishment during visits.

In the foster home, workers discovered that the child had anal warts that could be of a sexually transmitted nature. His parents were tested, and father had the same type of warts on his genitals. This led to a second juvenile petition being filed in the district court, alleging sexual abuse.

On March 15, 2005, the district court held an adjudication hearing on both juvenile petitions. The court adjudicated that physical abuse had occurred regarding the first petition. As to the second petition, the court adjudicated neglect, but not sexual abuse, regarding the anal warts because the warts could also be transmitted through shared bathing and there was no evidence to establish actual sexual abuse by the father.

The child remained in foster care, and his parents worked on their case plan over the course of several months in 2005. On August 10, 2005, he was returned to his parents' home on certain conditions, including that no corporal punishment be used on him.

In June 2006, the Cabinet received a report from a source who said it sounded like the child was being whipped and was screaming and yelling. Father admitted that he spanked him and had "probably gone too far" because the child had pulled his hair. The child was again removed and placed in another foster home. Another abuse petition was filed in district court. On June 17, 2006, the district court once again adjudicated that the child had been physically abused.

In 2008, the child's behavior in the foster home deteriorated, which was thought to be due to a change in his medication. On May 23, 2008, he was moved to Our Lady of Peace Hospital, a psychiatric facility in Louisville. In light of reports that he would become upset after visits from his father and the fact that the child suffered from a sexually-transmitted disease, the father was not permitted to visit the child in the hospital. However, the mother's visitation rights were not affected. She visited the child once during the ten months he was in the hospital.

During the time the child was in foster care and in the hospital, his parents complied with the terms of their case plan, including completing parenting classes, cooperating with assessments, and attending autism support group meetings and seminars. Notwithstanding this fact, in March of 2008, the Cabinet changed its permanency plan for the child from reunification

to termination of parental rights due to the length of time that the child had been in the Cabinet's custody, the Cabinet's general concerns for his safety, and the Cabinet's determination that despite meeting the terms of the case plan, mother and father were still not capable of parenting the child and meeting his needs.

The petition for termination was filed on July 16, 2008, and the hearing was held before the Caldwell Circuit Court on March 5, 2009. The Cabinet put on four witnesses: two social workers from the Cabinet, a psychologist, and a behavior analyst from Our Lady of Peace who had worked with the child. The parents put on five witnesses: their landlord, a local occupational therapist who worked with the family in the home, a social worker from the Pennyroyal Center, one of the child's teachers, and one of his bus aides.

The Cabinet's witnesses testified that, after assessments and observations, they could not recommend reunification of the child and his parents because the parents failed to demonstrate the ability to meet the child's needs, they did not accept responsibility for his problems, and they did not see the need to change their parenting behaviors.

One witness, a psychologist, specifically stated concerns about the father's failure to accept the child's anal wart diagnosis and the parents' denial that he had been sexually abused, even though the district court had found no sexual abuse. She also noted that the mother tended to minimize parental stress and parenting problems, that the child regressed when he returned to the parents' custody, and that she saw him become highly upset once when he interacted with the father. She formed her opinions primarily from reports from the child's school and the Pennyroyal Mental Health Center.

A behavior analyst from Our Lady of Peace who worked with the child testified how the child's behavior had improved at that facility. Initially, the child would hit walls, injure himself, or destroy property when he wanted attention or needed something, but learned to call a person by name and state what he wanted. His fine motor skills had improved since working with the occupational therapist, as well as his "soft" living skills like dressing himself. The child was not completely toilet trained yet, but would sometimes use the toilet if prompted. The analyst testified that spanking is not recommended in dealing with autistic children. However, he did concede that strategies for managing autistic children can be taught, that an average person can manage an autistic child if properly trained, and that some of the techniques the mother reported she used to manage the child's behavior were similar to the techniques used by employees at Our Lady of Peace.

A social worker with the Cabinet for Health and Family Services testified that she observed numerous raised, red welts on the child's buttocks and upper thighs, and marks on his chest, leg, face, back in 2004 before the juvenile proceedings, but that some were consistent with the lines of his diaper. During her visit, she testified, the child was found wearing a soaked pull-up diaper that was much too small for his size, and his bed linens and pajamas were also soaked with urine. She testified to her concerns for the child if he was reunified with his parents due to the history of physical abuse and neglect of the child, the father's admission that he spanked the child, the fact that the child is at higher risk for abuse because he is unable to communicate that he is being abused, the father's history of mental health issues, lack of stimulation provided by the parents, and the parents' general lack of un-

derstanding of autism and the child's needs.

The final witness for the Cabinet was a social worker who had been on the child's case since January 2005, who testified that although the mother knew how to deal with the child's behavior, she could not implement the strategies. She added that the mother now worked full-time, which would leave the day-to-day care of the child with his father. She was critical of the upkeep of the home since the mother started working full-time. She claimed father once lost his temper and verbally abused her during a home visit, which led her to bring a police escort on further visits. She also testified that the child was responding well to foster care, and was adoptable.

On cross-examination, the social worker admitted that the parents had been compliant with their treatment plan and that there was no specific incident that triggered the petition for termination of parental rights. She acknowledged that the mother demonstrated an interest in learning more about autism by researching different methods of dealing with autistic children and that the parents had made improvements in the upkeep of their home. Further, she testified that the mother had paid child support for the child while he was removed from the home.

In contrast, the five witnesses presented by the parents were consistently positive about the parents' involvement with the child.

The first witness was the service coordinator for the Pennyroyal Center, a community mental health center which provides services to, among others, developmentally disabled individuals and their families. She visited the child's home once a month, and stated that the parents were patient and nurturing with the child and never got upset with him. The home was very clean and homey. She also noted that the mother tried to educate herself about autism.

A school bus aide for the child while he was living at home in 2005 and 2006 testified that he was proud and excited to see his father when he got off of the bus, and that there was no sign that he was fearful of his father.

The parents' landlord testified that he observed the parents being loving and patient with the child and each other, and he never saw them angry or abusive. He also testified that the roach problem was remedied in the house, and that other improvements were made at the parents' request.

The child's school teacher before he was removed from the home and when he returned to the home in 2005 testified how difficult the child was to handle at school. The teacher testified that she never observed that the child was afraid of his parents, and that the parents always acted in a loving manner toward the child.

The final witness for the parents was an occupational therapist who worked with the child in the home for four years when he was living with his parents. She testified that he had no fear or apprehension towards his parents, and that the house was always clean and neat. She also observed that the parents were very loving with the child and receptive to whatever she told them, and were definitely capable of learning how to parent the child effectively.

At the conclusion of the testimony, the court agreed to take judicial notice of the two juvenile proceedings against the father regarding the child, though those are not in the record. However, it is undisputed that two adjudications of physical abuse were rendered against the father, and one adjudication of neglect was rendered re-

garding the child's contraction of anal warts, though no sexual abuse was found.

The trial court likewise took judicial notice of four domestic violence cases in the Lyon District Court from 1994 involving the father and his prior wife, and of the 1996 termination of the father's parental rights to a child from his prior marriage as a result of neglect.

At the conclusion of the termination hearing, the guardian ad litem for the child recommended that the court terminate the parental rights of the parents in the best interests of the child.

On May 27, 2009, the trial court entered an order declining to terminate parental rights to the child, issuing nine pages of findings of fact and conclusions of law. Specifically, the court found that the Cabinet had not met its burden of proving by clear and convincing evidence that termination of parental rights was in the best interest of the child, and that he did not find any evidence that the child would be abused in the future.

Thereafter, the Cabinet appealed to the Court of Appeals. In a split decision, the Court of Appeals reversed the circuit court, adjudging that the lower court erred in failing to terminate parental rights. Specifically, the court focused on the trial court's determination that termination of parental rights would not be in the best of interests of the child, as required under KRS 625.090(3), and held that the decision was clearly erroneous.

The case is now before us upon granting the parents' motion for discretionary review.

## II. Analysis

Seldom does a case present such diametrically opposed testimony from competent professionals about the primary facts at issue. This case involves a difficult situation where the parents of a child with severe autism and ADHD obviously have struggled with properly caring for such a challenging child. The Cabinet has had substantial involvement with the child, and the stakes are high when considering the child's future welfare. Given the disparate testimony, the role of the trial court in determining the credibility and weight to be given to the testimony and the sufficiency of the evidence is one of paramount importance.

The termination statute, KRS 625.090, establishes different standards of proof for the Cabinet and the parents whose rights are to be terminated when the court considers the best interest of a child. While the Cabinet must prove the necessary statutory allegations by clear and convincing evidence in order for the trial court to terminate parental rights, KRS 625.090(1) and (2), the parents must only present proof by a preponderance of the evidence that the child will not be abused or neglected in the future in order to allow the trial court to exercise its discretion *not* to terminate, KRS 625.090(5). The Cabinet did offer proof sufficient to meet the statutory elements in KRS 625.090(1)(a) and (2), and it offered proof of several of the factors for making the best interests determination in KRS 625.090(1)(b); this was followed by responsive proof by the parents. However, it is not until the conclusion of all the proof that a trial court must apply the terms of the statute, KRS 625.090(6), and certainly any of the proof it hears can weigh on its application of the statutory factors.

Following the dictates of the statute, before it could order involuntary termination of parental rights, the trial court first had to find by clear and convincing evidence that the child had been previously adjudicated to be an abused or neglected child or so find in the current proceeding.

KRS 625.090(1)(a)(1) and (1)(a)(2).[1] Here, it was undisputed that there had been such prior adjudications against the father, but not the mother. To him, the first statutory hurdle was met because of the prior adjudications against him, but the court would have had to find that the mother had abused or neglected the child in this proceeding in order to proceed further against her. *See* KRS 625.090(6) (requiring "a decision as to each parent-respondent").

Then, the plain language of the statute required the trial court to make at least one other determination from the statutory list in KRS 625.090(2) before it could consider termination. There was evidence in this case from which the trial court could find that the father's rights to another child had been involuntarily terminated, KRS 625.090(2)(h)(1), and that the child in this case was born subsequent to that termination, KRS 625.090(2)(h)(2), but no evidence whatsoever was presented as to whether the type of abuse or neglect was the same as in this case or that it had been corrected, as is required by KRS 625.090(2)(h)(3). This section (h) is one ground, requiring that all three parts be met before it applies, and this hurdle was not met. However, the trial court could and did find that the child had been in the custody of the Cabinet for 15 of the most recent 22 months before filing of the petition. KRS 625.090(2). None of the other subsections were sufficiently supported by the proof, but only one finding was required to satisfy this part of the statute.

But as part of determining the best interest of the child, and whether sufficient grounds for termination existed, the court was further required to consider several other statutory factors in KRS 625.090(3),

including any mental illness of the parents, the reasonable efforts of the Cabinet to reunify the family, the efforts of the parents to return the child to the home, the state of the child and payment of support by the parents while the child was in the Cabinet's custody. This is where the Court of Appeals believed the trial court was clearly erroneous.

But the trial court was entitled to rely on the witnesses it found *most* convincing, and its findings indicate that it gave significant weight to the parents' witnesses. And even when a court finds clear and convincing grounds to terminate, the court can still shift from considering that proof and consider whether the parents had established, by a preponderance of the evidence, that the child would not continue to be abused or neglected. KRS 625.090(5). The statute allows the court to exercise its discretion not to terminate upon such a showing.

■ Regardless, the trial court is never *required* to terminate under the statute as its authority to terminate is couched in the permissive "may" rather than the mandatory "shall," KRS 625.090(1), and the trial court has substantial discretion in determining the best interests of the child under KRS 625.090(1)(b) and (3). Indeed, the bulk of the statute, reflects a default preference against termination, which is why it states that no termination of parental rights shall be ordered *unless* the court makes the statutory findings based on the higher standard of proof of clear and convincing evidence. The Constitution itself requires the state to meet this burden of proof before a parent's rights may be terminated because of the "fundamental liberty interest" a parent has in

1. The statute allows a third showing—that the parent was convicted of a criminal abuse charge and more abuse is likely to occur, KRS 625.090(1)(a)(3)—but that possibility was not at issue in this case.

the relationship with a child. *See Santosky v. Kramer*, 455 U.S. 745, 768, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that a preponderance of the evidence standard to allow termination "violates the Due Process Clause of the Fourteenth Amendment" and that termination must be justified by at least clear and convincing evidence).

Whether the Cabinet failed to show by clear and convincing evidence that termination was in the child's best interest or if the parents established by a preponderance of the evidence that the child's best interest was to stay with them and that he would not be abused in the future, the parents maintain that the trial court's findings were supported by substantial evidence, and thus its judgment should not have been reversed. They also argue that the Court of Appeals erred in substituting its factual findings for those of the trial court. The Cabinet argues that there was clear and convincing evidence sufficient to support termination, and that the parents' witnesses were not persuasive.

 Because termination decisions are so factually sensitive, appellate courts are generally loathe to reverse them, regardless of the outcome. In reviewing a trial court's decision on a petition to terminate parental rights, an appellate court must apply the clearly erroneous standard of review. CR 52.01 ("Findings of fact shall not be set aside unless clearly erroneous...."); *see also J.M.R. v. Commonwealth, Cabinet for Health and Family Servs.*, 239 S.W.3d 116, 120 (Ky.App.2007), *overruled on other grounds by Colvard v. Commonwealth*, 309 S.W.3d 239 (Ky.2010). Under this standard, an appellate court is obligated to give a great deal of deference to the trial court's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them. *K.R.L. v. P.A.C.*, 210

S.W.3d 183, 187 (Ky.App.2006). Application of the law to the facts, however, will be reviewed *de novo*. *S.B.B. v. J.W.B.*, 304 S.W.3d 712, 716 (Ky.App.2010).

Although it is an unusual situation to be reviewing the trial court's *denial* of a petition to terminate parental rights, an unsuccessful party has the constitutional right to appeal said denial. *See* Ky. Const. § 115 ("In all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court, except that the Commonwealth may not appeal from a judgment of acquittal in a criminal case, other than for the purpose of securing a certification of law, and the General Assembly may prescribe that there shall be no appeal from that portion of a judgment dissolving a marriage."); *see also K.R.L.*, 210 S.W.3d at 186–87. That is what the Cabinet did.

In analyzing whether termination was in the best interest of the child, the court made several relevant findings, including the following: (1) that the parents have worked at accomplishing the return of the child to their home (¶ 41); (2) that the mother pays child support and the child receives some funds because of the father's disability payments (¶ 32); (3) that "there is no credible evidence that once reunited, the family would not be able to make progress" (¶ 33); (4) that the parents "did maintain a decent and clean household and had a loving relationship with [the child], despite the challenges" (¶37); and (5) that the "witness with the most experience within the home was occupational therapist Ms. Murray," who had "described the home as neat and the relationship between the parents as normal given the circumstances" and "said the parents could learn to parent, adequately and have shown a willingness to do so from her experience in assisting [the child]" (¶ 39). The court concluded in paragraph 42 that it "does not

find by clear and convincing evidence that termination would be in the best interest of the child," and reiterated in paragraph 43 that "[t]ermination of parental rights would not be in the best interest of the child." Though couched as a conclusion of law, the court also found that "[e]ventual reunification would still be in the best interests of the child."

In addressing the claim that these findings were not supported by substantial evidence, the Court of Appeals focused on the evidence presented by the Cabinet, though it admitted the existence of testimony in favor of the parents, "While there was some evidence presented in favor of [the parents] and their minimal efforts to improve the care of their child, such evidence did not constitute substantial evidence that termination was not in [the child's] best interests, much less clear and convincing evidence."

This last statement is revealing, at least as to how the Court of Appeals approached this case. That court, at least in part, seemed to think that the trial court's finding either in favor of or against termination had to be supported by clear and convincing evidence. The Cabinet also approached the issue in the same way, at least based on the Court of Appeals' description of its argument: "The Cabinet argues that the trial court's determination that termination was not in [the child's] best interest is not supported by clear and convincing evidence and that the evidence instead overwhelmingly favors termination." However, it is only when a court does decide to terminate that clear and convincing evidence is required. Otherwise, there need be only substantial evidence to support a trial court's finding in order to avoid reversal.

■■■ That one side presents more testimony than the other, or that one side's evidence seems superior to the other's, at least from the appellate perspective, has no bearing. In reviewing a trial court's findings, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. As the court sitting in the presence of witnesses, a trial court is in the best position to evaluate the testimony and other evidence. Indeed, "judging the credibility of witnesses and weighing evidence are tasks within the *exclusive province of the trial court.*" *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky.2003) (emphasis added). "[M]ere doubt as to the correctness of a finding will not justify its reversal, and appellate courts should not disturb trial court findings that are supported by substantial evidence." *Id.* (footnotes, quotation marks, and brackets omitted).

■■■ The trial court was presented with testimony from both sides. The Cabinet's witnesses were firmly set against reunification. But the parents' witnesses had experience with the family in more direct ways than the Cabinet witnesses did, and if believed, established that the parents were loving and had the potential to learn to care for their child. The parents' witnesses were not interested parties; they included school employees and mental health workers, all of whom had obligations to protect the child. The trial court chose to believe the parents' witnesses. Their testimony was relevant and substantive; it was sufficient to lead a reasonable person to find that the Cabinet had failed to show that termination was in the child's best interest. This Court cannot say that the trial court was clearly erroneous in choosing to believe the witnesses offered by the parents, nor that their testimony was insufficient to support the trial court's determination.

Additionally, there was little negative testimony regarding the mother, and certainly not enough to terminate *her* paren-

tal rights. Both parents have individual rights to their children; they are not a package deal, per se. No substantial evidence was developed by the Cabinet as to whether the mother could parent the child on her own or not, or whether she was willing to be a single parent.

Beyond this borderline de novo review, the Court of Appeals overemphasized the factors in KRS 625.090(3), treating them as though they were a checklist. As the statute itself notes, the factors are to be "considered" in deciding whether termination is in the child's best interest. They do not necessarily dictate a result and are always subordinate to the best-interest finding that the court is tasked with making.

Though the trial court in this case did not expressly state that it was considering KRS 625.090(5), many of its findings of fact went to a finding under this subsection. The court noted repeatedly in its findings that the parents were loving, that they had the potential to learn at least some appropriate parenting skills, and that they had repeatedly demonstrated a willingness to learn and change their behavior at the Cabinet's request. And although this section comes sequentially after the factors to be considered in making the best interest determination in the statute, it must be considered in making the best interest determination if the parents present such proof. Otherwise, this section of the statute would have no meaning. That the parents can persuade the court that the child will not be abused in the future obviously goes to what is in the child's best interest going forward/The trial court's findings clearly indicate that the parents' proof also convinced the court that termination was not in the child's best interest at that time.

Ultimately, this Court cannot overturn the trial court's decision, which was grounded in the evidence and was the result of an exercise of sound discretion, simply because it disagrees with that court's view of the evidence or might have ruled differently in the first instance. Following each incident, the child and family were provided services. Chapter 620, under which dependency, abuse, and neglect actions proceed, is designed to handle immediate problems and offer temporary solutions with the primary goal of enabling a child to remain in his home with assistance from the Cabinet for Health and Family Services. The system did what it was supposed to do for this family under those statutes.

However, at some point in a case, as happened in this case, the Cabinet may change its goal for a child committed to them to a permanency determination rather than a temporary one. In such cases, the Cabinet files a petition for termination of parental rights. In effect, if parental rights are terminated, it is as if the parents of a child suddenly died, as there is no longer a legal right to contact between the parents and child. In a relationship that has developed over a period of years such as the one in this case with this child who is now 15 years old, strong emotional ties flow both ways. The circuit court or family court that hears termination cases must include that fact in its analysis of whether it is appropriate at the time of the termination hearing to end that relationship permanently, based on the record. If the court does not terminate the relationship, services can be continued—as they were here—until further orders of the court, which may include maintaining a child in foster care or an institution.

■ Finally, it is worth noting again that a termination of parental rights proceeding implicates fundamental constitutional rights. There is no dispute that "freedom of personal choice in matters of

family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Santosky*, 455 U.S. at 753, 102 S.Ct. 1388. The stakes are high in termination proceedings because "[v]ictory by the State not only makes termination of parental rights possible; it entails a judicial determination that the parents are unfit to raise their own children." *Id.* at 760, 102 S.Ct. 1388. And because the stakes are so high, parents are entitled to substantial protection:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs.

*Id.* at 753, 102 S.Ct. 1388.

Termination proceedings are—and should be—weighted against the State. Thus, the default position in such a proceeding is that the child is to be left with the parents or returned to them, with or without ongoing services as needed. The State cannot disturb this natural order lightly. When there is substantial competent evidence that the trial court finds persuasive, as is the case here, an appellate court should not intercede.

### III. Conclusion

Here, the trial court judged the facts on their merits, weighed the credibility of the witnesses, and determined that termination was not appropriate at the time of the hearing. There was substantial evidence to support the trial court's decision. In reversing that decision, the Court of Appeals improperly substituted its judgment for that of the trial court. For these reasons, the decision of the Court of Appeals is reversed, and the judgment of the Caldwell Circuit Court is reinstated.

MINTON, C.J.; ABRAMSON and VENTERS, JJ., concur. SCHRODER, J., dissents by separate opinion in which SCOTT, J., joins. CUNNINGHAM, J., not sitting.

SCHRODER, J., Dissenting:

The victim in this case is only a child, a boy with profound mental disorders and extremely limited communication skills. He suffers from autism, attention deficit hyperactivity disorder, and bipolar disorder. He was also noted to be mentally retarded and suffering from severe developmental delays as a consequence of the poor parenting he received at the hands of his parents. This disabled child was entirely dependent on his parents.

Under the "care" of his parents, this child with serious disabilities and substantial needs was both physically abused and neglected on multiple occasions. He was found with red welts and bruises all over his body-on his buttocks and thighs, lower back, right ear, face, and upper and lower abdominal area. He was discovered in his parents' home wearing a urine-soaked pull-up diaper, much too small for his size. This disabled child was found to have anal warts of a sexually transmitted nature, the same type of warts that his father had on his penis. After a neighbor reported hearing the child screaming and being whipped by his father, extensive bruising was found on the child's buttocks. This child has been in and out of foster care and blossomed when away from his parents.

The Cabinet brought all the above facts to the trial court, which agreed that the young boy had been physically abused and neglected, but ruled that the termination of rights of the parents who abused and neglected him was not in his best interest.

The Court of Appeals disagreed with the trial court's application of the law, and despite the deference given in such cases, it reversed and remanded the case back to the trial court with instructions to terminate the parental rights of this child's biological parents.

As is appropriate, this Court considers termination of parental rights a serious matter, and we accepted discretionary review to insure that termination of the parents' rights followed due process. Nevertheless, after careful review of the record below, it is clear that the trial court failed to apply the law correctly—a mistake the majority repeats. These errors of law leave a defenseless, disabled young boy vulnerable to the parents who have abused and neglected him, and prevent the Cabinet from attempting to find this child a permanent, loving and stable therapeutic adoptive home.

In this case, the trial court made two of the three prerequisite findings in order to involuntarily terminate the parental rights. It found, by clear and convincing evidence, that the little boy was an abused and neglected child under KRS 625.090(1)(a),[2] and it also found the existence of one of the grounds for termination under KRS 625.090(2), namely, that the young boy had been in foster care for fifteen of the most recent twenty-two months preceding the filing of the petition to terminate parental rights.[3]

The final requirement for termination of parental rights under KRS 625.090(1)(b) is a finding that termination would be in the best interest of the child. Pursuant to KRS 625.090(3), the court *must* consider specific factors in making such a determination.[4] Findings 41 through 43 of the

2. Finding no. 30

3. Finding no. 31. The findings above, that the child was previously adjudged to be an abused and neglected child under KRS 625.090(1)(a), and that the child had been in foster care for fifteen of the most recent twenty-two months under KRS 625.090(2)(j), apply equally with respect to both the father and the mother of the child in question, despite the majority's assertion that the evidence did not support terminating the mother's rights. To be clear, a parent need not administer the blows in order to be held legally responsible for abuse or neglect. Furthermore, in one of the adjudged instances of abuse, the mother acknowledged that she instigating the abuse by directing the father to "tap the butt" of the little boy because he was acting up. The father whipped the little boy, which left four distinct bruises on the little boy's buttocks.

4. These factors are: (a) Mental illness as defined by KRS 202A.011(9), or mental retardation as defined by KRS 202B.010(9) of the parent as certified by a qualified mental health professional, which renders the parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for extended periods of time; (b) Acts of abuse or neglect as defined in KRS 600.020(1) toward any child in the family; (c) If the child has been placed with the cabinet, whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents unless one or more of the circumstances enumerated in KRS 610.127 for not requiring reasonable efforts have been substantiated in a written finding by the District Court; (d) The efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child; (e) The physical, emotional, and mental health of the child and the prospects for the improvement of the child's welfare if termination is ordered; and (f) The payment or the failure to pay a reasonable portion of substitute physical care and maintenance if financially able to do so.

trial court's order purport to address whether termination would be in the best interest of the child in this case. In these three findings, constituting only five sentences collectively, the trial court found: (1) no evidence of mental illness of either parent, (2) evidence of abuse "as previously described",[5] and (3) that the "parents have worked at accomplishing a return of the child to their home."

The trial court clearly, *and admittedly,* failed to consider all of the factors set forth in KRS 625.090(3)(a)–(f), in contravention of the mandatory language in KRS 625.090(3), which requires that all of the enumerated factors be considered by the trial court in determining the best interests of the child.

First, KRS 625.090(3)(a) requires the court to consider the mental illness of the parent. I would point out a blatant error in the trial court's findings of fact. In paragraph (41), the court states "there is no evidence of mental illness or mental retardation of either parent." It is difficult to comprehend the basis of this finding, as *the record is replete with evidence of mental illness* of the father and mother. The CATS report,[6] which was admitted as an exhibit for the Cabinet, reveals that T.B.H. has a history of, and active, anxiety and depressive disorders for which he receives psychotropic medication. Further, T.B.H. recounted a mental health history beginning with treatment in 1986, escalating to a "nervous breakdown" in 1993, requiring inpatient psychiatric hospitalization. There was also evidence that T.B.H. continues to receive outpatient mental health services for "emotional stability" and to "deal with stress." With respect to D.G.R., the record reveals a mental health history of a psychiatric hospitalization following an overdose. *The trial court and the majority chose to ignore the record. Why?*

With regard to KRS 625.090(3)(b), the trial court devoted much more of its findings to issues related to whether or not A.H. had regressed in his behavior and life skills *than to the prior adjudicated physical abuse and neglect of A.H. and the potential for abuse and neglect in the future.* The court briefly acknowledged, "The acts of abuse have been specified above in the juvenile proceeding," and that the "Cabinet's efforts with the parents have primarily been aimed at assisting the parents in meeting [A.H.'s] special needs and not in abuse prevention." Nor did the trial court appear to consider the other acts of abuse or neglect toward other children in the family as directed by KRS 625.090(3)(b).[7]

The trial court again erred with respect to KRS 625.090(3)(c). KRS 625.090(3)(c) requires the court to consider whether the Cabinet has made reasonable efforts to reunite the child with the parents. The trial court unilaterally (and in contravention of the expressed language of the statute) chose not to consider this factor, stating that it "does not address reasonable efforts of the Cabinet [to reunite the child with the parents]" because it had already determined, without considering this required element, that termination was not in the child's best interest. However, the

---

5. Apparently identified in findings numbered 15 through 19 of the trial court's decision.

6. University of Kentucky Child and Adolescent Trauma Treatment Center.

7. Although the trial court took judicial notice of the prior adjudication of neglect against the father in the case as it related to an older half-sibling of the little boy in this case, *it did not address them within the assessment of the child's best interest.* The record also reveals that the mother's parental rights to her older child were also terminated.

mandatory language in KRS 625.090(3) requires that all of the factors therein be considered by the trial court in determining the best interests of the child, including whether the Cabinet has made reasonable efforts to reunite the child with the parents under subsection (3)(c). Thus, once more, the trial court erred in failing to consider the required elements before it determined whether termination was in the best interests of A.H.

Further, as to KRS 625.090(3)(d)—the efforts of the parents in making it in the best interest of the child to return to the home—the court found that D.G.R. and T.B.H. had worked with the Cabinet at accomplishing a return of the child to their home and had consistently expressed the desire to have A.H. back in the home. However, *the court did not discuss the likelihood of A.H. being physically abused or neglected again if he was reunified with D.G.R. and T.B.H., which is probably the most significant consideration in this case.* The parents have already been given a second chance with A.H. when he was returned home to their care in August 2005. In spite of the case plan's requirement that the parents not use corporal punishment on the child, T.B.H. admittedly "went too far" and spanked A.H. for acting out, resulting in severe bruising and in another adjudication of physical abuse and A.H.'s second removal from the home.

Unbelievably, from a reading of the findings of fact and order, it does not appear that the court considered KRS 625.090(3)(e) at all! This factor required the trial court to consider the physical, emotional, and mental health of the child and the prospects for the improvement of his welfare if termination was ordered, in its determination of this child's best inter-

ests. While the court recognized that A.H. was autistic and that he had behavioral problems, *the court did not consider the physical, emotional, and mental well-being of A.H. as a victim of the physical abuse and neglect in this case*—which included two adjudications of physical abuse and one adjudication of neglect. This is especially shocking in light of A.H.'s vulnerability to such abuse because *his limited communication skills are such that he cannot tell anyone if he is being physically or sexually abused or respond to questions about suspected abuse.*

The majority excuses all of the above grievous errors by relying on KRS 625.090(5). Although this provision gives the trial court discretion to refrain from terminating parental rights where the parents prove, by a preponderance of the evidence, that the child will not continue to be abused or neglected in the future, this analysis is not a substitute for the best-interest finding that the trial court is REQUIRED to make under KRS 625.090(3).

The majority appears to confuse the nature of KRS 625.090(3), by arguing that its elements are not a checklist and are "always subordinate to the best-interest finding that the court is tasked with making." This sort of circular logic completely ignores the directive of KRS 625.090(3). This section is not "subordinate to the best-interest finding," but rather it is an *express* and *unambiguous* requirement *of the* best-interest finding.[8]

The majority's assumption that the trial court was merely relying on KRS 625.090(5) in finding "what is in the child's best interest going forward," is at best, reaching, and at worst, encouragement of a trial court's abdication of its statutory im-

---

8. KRS 625.090(3) provides, in part, "In determining the best interest of the child and the existence of a ground for termination, the Circuit Court *shall* consider the following factors ..." (emphasis added).

perative to fully consider the specific elements in its determination of what is in a child's best interest. KRS 625.090(5) does not absolve the trial court of its imperative to consider all the required elements.

Moreover, in reviewing the specific factors which the trial court was required to, *but failed to*, consider pursuant to KRS 625.090(3), I note that the application of the law to the facts is reviewed *de novo*. *S.B.B. v. J.W.B.*, 304 S.W.3d 712, 716 (Ky. App.2010). Sound legal reasoning would hold that a remand in this case is necessary, so that the trial court can reconsider what is in this disabled child's best interest, *examining all the elements that it is mandated to consider pursuant to KRS 625.090(3)*.

The trial court found that the child in this case was severely autistic, that he is in need of care and assistance 24 hours per day, 7 days per week, and that he suffered from attention deficit hyperactivity disorder.[9] The trial court took judicial notice of adjudications of the abuse and neglect of this disabled child in three separate instances. The first instance, based on numerous marks found all over the little boy, resulted in the child being removed from his parents in October 2004. During this removal, it was discovered that the child also had anal warts "highly suspicious of sexual abuse." After a medical examination, these same type of sexually transmitted warts were discovered on his father's penis. In April 2005, the Caldwell District Court entered an order finding abuse as to

the marks on his body and neglect as to the anal warts.[10] Nevertheless, the little boy was returned to his parents' custody in August 2005.[11]

While in the care of his parents, and *in contravention of court order prohibiting corporal punishment*, the father admittedly "went too far" in his spanking of the child after he was directed by the mother, in contravention of the court order, to "tap the butt" of the boy when he was acting out. The father whipped the little boy and left four distinct bruises on his buttocks. A neighbor reported hearing the father screaming at the child and hearing the little boy crying. The explanations reported to authorities by both parents were entirely inconsistent with the injuries the little boy sustained. The little boy was removed from his parents again after this instance of abuse, and a third finding of abuse was entered for the whipping of this disabled little boy.

In contrast to his life while in the custody of his parents, where the record shows that he developed a severe developmental delay caused-not by autism—but by the social isolation imposed on him by his parents and by the failure of his parents to train him in other areas, for the past five and a half years this previously abused and neglected little boy has resided in therapeutic foster care homes and in a psychiatric hospital, where by all accounts, he has started to learn skills such as communicating, walking up stairs, eating with

9. Findings nos. 2 and 8.

10. Despite the evidence that both the little boy and his father shared the same type of sexually transmitted disease and that the little boy's disease manifested on the edge of his anus, and *despite the fact that three medical doctors agreed that, especially given the little boys handicaps, this was evidence of sexual abuse*, the trial court apparently deferred to a

letter from the father's primary care physician that, although highly unlikely, sexually transmitted warts could be transmitted through contact with the same wash cloth or towel. Thus, it found that sexual abuse was unsubstantiated and entered a finding of neglect as to both parents.

11. Findings nos. 15–17.

a spoon, and showing affection.[12] The record reveals, however, that upon returning to the custody of his parents, his progress with respect to these skills and others deteriorated.

The majority did not find clear error in the trial court's "choosing to believe the witnesses offered by the parents" and argued that it could not say that such testimony was "insufficient to support the trial court's determination." I disagree. The trial court appears to have glossed over the uncontradicted, objective evidence of the severity of the of the little boy's impairments, even after five and a half years of living in therapeutic foster homes, the number and length of time the little boy has been in a foster care setting or a psychiatric hospital, and did not appear to consider the gravity of the instances of child abuse and neglect or the significance of the fact that one of these instances occurred *after* the little boy was returned to his parents for a 9 or 10 month period in 2005–2006. Likewise, although the trial court mentioned the fact that the little boy acquired a sexually-transmitted disease while in the care of his parents (namely, anal warts), none of the above factors appear to make it into its consideration of "the best interest" of the child. Finally, although the trial court stated cursorily that neither parent had mental health issues, *the record clearly shows that each parent has a record of mental health issues*, with the father undergoing one or two psychiatric hospitalizations in the past and, as of the most recent records, still endorsing depressive and anxiety symptoms and still being prescribed psychotropic medication. The majority, in its assessment, commits these same errors and omissions.

As it is clear that the trial court failed to conduct the required "best interest of the child" analysis pursuant to KRS 625.090(3), I therefore dissent. As Justices, our duty is to ensure that the trial court has reviewed the statutory considerations and followed the law in its rulings. Because the trial court in this case clearly failed to do so, I would vacate the trial court's order denying termination, and remand the case to the trial court for corrected findings of fact and analysis as required by the statute. Anything less is not justice for this child.

SCOTT, J., joins.