v.

COMMONWEALTH of Kentucky, CABINET FOR HEALTH AND FAMILY SERVICES; K.G.C.; and R.A.C.[1], Appellees and

W.L.C., Appellant

v.

Commonwealth of Kentucky, Cabinet for Health and Family Services; L.R.C.; and R.A.C., Appellees

NO. 2015–CA–000164–ME

Court of Appeals of Kentucky.

RENDERED: FEBRUARY 12, 2016; 10:00 A.M.

1. The notice of appeal mistakenly identifies R.A.C. as the biological mother. In fact, he is the biological father. He has not filed an appeal in this case.

**BRIEF FOR APPELLANT:** Joshua G. Berkley, Lexington, Kentucky

**BRIEF FOR APPELLEE, CABINET FOR HEALTH AND FAMILY SERVICES:** Kristin L. Wehking, Lexington, Kentucky

**BEFORE: NICKELL, STUMBO, AND VANMETER, JUDGES.**

*OPINION AFFIRMING CASE NO. 14–AD–00117 AND ORDER STRIKING AMENDED NOTICE OF APPEAL PERTAINING TO CASE NO. 14–AD–00118*

NICKELL, JUDGE:

### PREFATORY STATEMENT

W.L.C.[2] is the biological mother of two children—K.G.C., a girl born on March 20, 2010, and L.R.C., a boy born on December 3, 2012. The Cabinet for Health and Family Services (CHFS) petitioned the Fayette Circuit Court, Family Division, to terminate all parental rights (TPR) to both children. Following a trial, the court issued separate judgments—one for each child—involuntarily terminating the rights of both parents to both children.

On January 30, 2015, W.L.C. timely moved to appeal from the final judgment entered on December 30, 2014, in Case No. 14–AD–00117—the case pertaining to her daughter. The judgment pertaining to her son, entered in Case No. 14–AD–00118, was not referenced in the notice, nor was L.R.C. named as an appellee. As explained in the Opinion that follows, upon review of the record, the briefs and the law, we affirm the grant of TPR in Case No. 14–AD–00117 pertaining to K.G.C. As explained in the Order that follows, we strike—for failure to substantially comply with CR[3] 73.02(1)(e)(ii)—the amended notice of appeal pertaining to Case No. 14–AD–00118.

*OPINION AFFIRMING CASE NO. 14–AD–00117*

### FACTS

CHFS became familiar with W.L.C. and her family when it opened a non-removal

---

2. Pursuant to Court policy, the parents and children involved in this matter will be referred to by initials only to protect the identity of the children.

3. Kentucky Rules of Civil Procedure.

petition of neglect based on two concerns—drug abuse by W.L.C. and educational neglect by both W.L.C. and R.A.C.[4] W.L.C. was using marijuana and the couple's oldest son, B.C., had amassed thirteen unexcused absences by March 7 of the 2012–2013 school year. W.L.C. stipulated her substance abuse and both parents stipulated educational neglect. To address the situation, W.L.C. moved out of the home but was allowed supervised visits with the three children who remained in the home in R.A.C.'s custody and care. Life appeared to be back on track while the children were in R.A.C.'s exclusive care.

About a week later, in April 2013, as the children and their father were reuniting with W.L.C., the entire family was involved in a severe motor vehicle accident in which B.C. died, and the parents sustained significant injuries[5] requiring extended hospitalization. With R.A.C. in a life threatening situation, and W.L.C. in critical condition, a petition alleging dependency of the two remaining children—ages five months and nearly three years—was filed. The surviving children—although physically bruised and shaken from the collision—stayed briefly with their paternal grandmother before entering foster care on May 1, 2013, where they have remained in the same family placement and are thriving.

Trial occurred on Monday, December 22, 2014. Just as testimony was about to begin, defense counsel for both parents asked to approach the bench whereupon they advised the court their clients had been slow in contacting them. W.L.C.'s attorney said he had been in contact with her for only about one week. Both attorneys expressed concern about their clients promising proof that had not been delivered. Both W.L.C. and R.A.C. had indicated to counsel a social worker in Clay County had the promised documents, but counsel for the Cabinet responded no Clay County social worker was involved with the family. W.L.C.'s attorney stated he had managed to procure results of one clean drug test. The court noted defense counsel's objection to going forward with trial that day, but found the parents had "ample opportunity" to get the desired proof to previous counsel and failed to do so. Thereafter, trial began.

<hr>

4. Previous counsel began representing the couple in April or May 2014. On September 8, 2014, CHFS moved for appointment of separate counsel for the parents or execution of dual representation waivers. During a hearing on September 10, 2014, adequacy of a single answer—filed on behalf of both parents, but signed by only W.L.C. on behalf of herself and her husband due to his precarious health—was questioned, especially since W.L.C. did not possess her husband's power of attorney. As a result of this discussion, the court directed R.A.C. to verify the answer now that his health had improved. On October 14, 2014, the children's guardian *ad litem* (GAL) moved to compel dismissal of previous counsel due to conflicts of interest. A week later, new counsel was appointed to represent R.A.C. Separate counsel was appointed to represent W.L.C. a few weeks after that, and trial was set for December 22, 2014.

5. R.A.C. testified both his ankles were crushed; his spleen was removed; two rods were placed in his left forearm; he underwent two knee replacements; a pin was placed in his right hip; his left femur was injured; every rib on his right side was broken; and, he had a busted lung. He was hospitalized from the day of the accident until May 8, 2013, the day his oldest son—B.C.—was buried, and he was transferred to Cardinal Hill Hospital where he remained about 45 days before being discharged to continue physical therapy at home. Initially R.A.C. was confined to a wheelchair. It was not until about March 2014 that R.A.C. regained the ability to get himself out of bed. W.L.C. described her injuries as a crushed nose; face and skull fractures; a broken back; and a fractured pelvis.

Nakia Walker is the family's ongoing case worker. At trial, she testified as follows: K.G.C. and L.R.C. were committed to CHFS by the Fayette Circuit Court; CHFS made reasonable efforts to reunite the family, including creating case plans for both parents, but those efforts were waived on or about February 24, 2014, because the parents continued testing positive for marijuana and suboxone; February 14, 2014, was the last known date for which CHFS had drug screens for W.L.C. and R.A.C. with both testing positive for marijuana and suboxone—at that time, neither had a valid prescription for suboxone. It appearing neither parent had successfully completed substance abuse treatment, CHFS ceased receiving updates on the couple.[6]

Walker testified CHFS had developed case plans for both parents, but the couple had failed to work those plans despite being given sufficient time to do so. Walker stated she was unaware of any beneficial services that had not been offered or recommended to the family. Under her case plan, W.L.C. was to complete substance abuse and parenting assessments; receive in-patient treatment; complete the Targeted Assessment Program (TAP); and attend grief counseling offered by hospice. W.L.C. did not successfully complete any of the recommendations. In describing W.L.C.'s actions, Walker testified she entered the Schwartz Center—a chemical dependency treatment center—on two occasions, but left the facility both times within 48 hours of arrival; she was terminated from the Pride Program—a substance abuse treatment program—for noncompliance because she failed to attend

class and had dirty drug screens; she was terminated from the TAP Program due to noncompliance; and, she did not fully participate in grief counseling which had been recommended to help her cope with her son's death—she attended only one session.

W.L.C. last visited with her children in August or September 2013; thereafter, her visits were suspended due to persistent drug use. Walker noted when W.L.C. visited the children she often brought gifts, and while she played and talked with them, Walker could not say the children bonded with her.

Walker testified neither parent had provided essential parental care and protection for the children for at least six months and improvement was not reasonably expected. She noted W.L.C. was at least $4,000 behind in child support and R.A.C. was at least $2,000 in arrears. As the children's GAL noted, both parents were behind in their child support obligations but had money to acquire marijuana. Walker also testified the parents, for reasons unrelated to poverty, but wholly related to substance abuse, had failed to provide to the children essential and reasonably necessary food, clothing, shelter, medical care, and education. Walker did not reasonably expect improvement in this area either because it would require demonstration of a "clean and sober" lifestyle they were not living.

In describing the children's lives in foster care, Walker stated both are "doing extremely well" in a "loving" foster home. She said both were "doing beautiful," and had been living in foster care at least

---

6. In August 2014, both parents moved from Fayette County to Clay County but did not timely apprise Walker of the move. The parents maintained they acquired a new social worker in Clay County, but Walker was unaware of another social worker being assigned to the family. Had Walker been aware of the move, and reasonable efforts not been waived due to continued substance abuse, Walker would have requested a courtesy call occur in Clay County.

fifteen of the last twenty-two months. She also noted the foster parents had expressed an interest in adopting both children so they can remain together.

The children's foster mother was called as a witness by CHFS. She testified the children had been in her home for twenty-one months, since May 1, 2013; her home is their one and only placement; and they are doing "awesome." Initially, K.G.C. spoke often of B.C., her deceased brother, but she does not mention him as much now. K.G.C. has learned the alphabet, can write her name, and no longer wears Pull-Ups diapers. She speaks often of her friends and teachers.

According to the foster mother, L.R.C. is also doing "really well." Initially he required a nebulizer every four hours, but now that he is in a smoke-free home, he does not require the machine and is meeting all developmental milestones.

When CHFS closed its proof, W.L.C. took the stand in her own defense. She testified she is unemployed and awaiting a disability hearing. She described her disability as two-fold—she has memory issues and cannot stand for long periods of time due to having a pin in her hip. She stated she has had substance abuse issues since the wreck, but acknowledged recreational marijuana use before the accident. She said she ceased using marijuana during her pregnancies, and identified two setbacks in completing her case plan—the death of her oldest son and grief. She acknowledged having a "serious" drug abuse problem, but stated she now attends church more often; has received counseling in Clay County; attended three grief counseling sessions in Fayette County; has completed all GED classes but has not taken the final GED exam; and, had clean random drug tests through a doctor's office in September, October and November, 2014. Her counsel placed results of the September 2014 drug screen into the record—he did not have results of any other tests or proof of completion of any portion of his client's case plan. W.L.C. admitted she had not completed drug abuse treatment, but claimed she had finished parenting and early childhood development classes. She stated she plans to remain drug free and intends to accomplish this goal by staying away from drug users, including old friends who use drugs.

Under cross-examination by the Cabinet, she stated she was prescribed suboxone to transition away from tramadol which she had received for whiplash. While she testified on direct examination she had ceased smoking marijuana while pregnant, she admitted L.R.C. was born with marijuana in his system. She explained this occurrence by stating she had used marijuana two to three days before giving birth to her youngest son.

On further questioning by the Cabinet, she stated her prior attorney had not faxed to her current attorney the clean drug screens for October and November 2014. In admitting she had never paid child support, she claimed she had never been told she owed child support.

R.A.C. also testified in his own defense. He stated he is twenty-seven years old, last worked as a stocker at Wal–Mart, and is now unable to work. He said he has no recollection of the April 2013 accident. Much of his testimony focused on his injuries, recovery and current capabilities. He stated he no longer has a medical card because his children do not live in his home; in August, he and his wife moved from Fayette County to his native Clay County where the cost of living is lower; he completed parenting and child development classes; he believes he is now physically and mentally capable of caring for his children; and, he expects a large settlement from the accident.

At the conclusion of R.A.C.'s testimony, the court questioned him about documents he and his wife had referred to in their testimony but had not provided to the court—drug screen results and certificates of completion for classes they claimed they had finished. R.A.C. responded it takes time to acquire documents but he believed the items had been faxed to their previous counsel. He said he learned on Thursday that trial would occur the following Monday.

At the court's request, W.L.C. returned to the witness stand. She said their previous counsel was hired in April or May 2014. According to W.L.C., prior counsel requested copies of medical reports, had the family compile a list of potential witnesses, and suggested W.L.C. see a doctor and request random drug tests. She also testified prior counsel told her not to speak to the social worker—he would do that.

The court noted trial was originally set for July 8, 2014, but was continued due to prior counsel's unavailability. Trial was next set for September 10, 2014, but that date was also continued. When W.L.C. stated a "Ms. Gates" was awaiting certificates of completion for parenting and childhood development classes, CHFS agreed to stipulate both parents had completed those classes.

Finally, the court asked W.L.C. about tobacco use in the home. W.L.C. admitted both parents smoke cigarettes, but after L.R.C.'s birth, they started going outside to smoke and put up "No Smoking" signs on their home's exterior door for their young son's benefit. W.L.C. acknowledged being aware of the effect of smoke on L.R.C. and admitted the child had been hospitalized twice for RSV.[7] The foster mother stated soon after L.R.C. arrived in her home she replaced the child's nebulizer due to a dirty filter.

On December 30, 2014, the trial court entered an Order Terminating Parental Rights and Order of Judgment. The court found K.G.C. is an abused or neglected child; for at least six months, the parents failed to provide essential parental care and protection and that was not reasonably expected to change; the parents failed to provide the children essential necessities such as food, clothing, shelter, medical care and education and that was not reasonably expected to change; CHFS had offered or provided all reasonable services in an attempt to reunify the family; TPR was in the child's best interest; and, CHFS was best qualified to receive custody of the child. As a result, K.G.C. was placed in the Cabinet's custody with authority to place the child for adoption. It is from this judgment that W.L.C. appeals.

## ANALYSIS

We review a TPR order for clear error under CR 52.01, giving great deference to the trial court's findings and disturbing those findings only if they are unsupported by substantial evidence. *K.R.L. v. P.A.C.*, 210 S.W.3d 183, 187 (Ky. App.2006). We review the trial court's application of the law to the facts *de novo*. *S.B.B. v. J.W.B.*, 304 S.W.3d 712, 716 (Ky. App.2010). W.L.C. complains TPR was not based on substantial evidence and trial should have been delayed to allow her an opportunity to secure negative drug test results essential to her defense. We disagree and affirm.

As a predicate to ordering involuntary TPR, a trial court must find by clear and convincing evidence the child was previously adjudicated an abused or neglected child or make such a finding in the current

---

7.  Respiratory syncytial virus causes infections of the lungs and respiratory tract.

proceeding. KRS[8] 625.090(1)(a)(1) and (1)(a)(2). Here, there is no dispute K.G.C. was determined to be an abused or neglected child as defined in KRS 600.020(1).

■ Next, the trial court must find evidence of at least one ground listed in KRS 625.090(2). Walker testified to at least three of them—failure to provide parental care and protection for at least six months with no expectation of improvement under KRS 625.090(2)(e); failure to provide essential food, clothing, shelter, medical care, or education with no expectation of improvement under KRS 625.090(2)(g); and, the child had resided in foster care fifteen of the most recent twenty-two months under KRS 625.090(2)(j). Proof of only one ground was required; CHFS offered proof of three grounds which W.L.C. did not refute, and the trial court found existed.

Consistent with KRS 625.090(3), the trial court heard testimony from CHFS about the case plan it developed to reunify the family. W.L.C. maintained she had completed parenting and childhood development classes. While she offered no physical proof of completion, the Cabinet stipulated as much. But the crux of this case was not parenting skills, it was W.L.C.'s continued substance abuse issues. She claimed her reliance on marijuana and suboxone (for which she did not have a prescription at the time of her last positive drug test) had waned, but she offered proof of only one clean test, despite claiming she had been clean for at least three months.

Citing *D.G.R. v. Commonwealth, Cabinet for Health & Family Servs.,* 364 S.W.3d 106 (Ky.2012), W.L.C. claims there was no substantial proof supporting TPR. As explained above, we disagree. As the

trial court stated at the conclusion of the hearing, this was a young, responsible family. When the oldest child began missing school, the family addressed the issue. Then, about a week later, tragedy struck. The oldest of three children died in a motor vehicle accident that severely injured both parents and required long-term hospitalization. Professional help has been offered to W.L.C., but she has not done the work required of her to address her admitted substance abuse issues and her grief. The trial court's findings were supported by substantial evidence and will not be disturbed.

■ W.L.C. next alleges trial should have been delayed *again* to allow her an opportunity to secure results of *clean* drug tests for October and November 2014. Until trial in December 2014, the last drug test of which CHFS was aware occurred on February 14, 2014—and it was positive for marijuana and suboxone. At trial, W.L.C.'s attorney produced results of a clean test that occurred in September 2014. W.L.C. claimed she had clean drug screens for three months in a row, yet there was no explanation for the absence of the two other results. There was also no suggestion of what W.L.C. would do to secure the missing test results that she had not already done, nor why she had not already taken those steps. Furthermore, there was no suggestion of how much time would be needed for her to accomplish those steps. Granting a continuance is within the trial court's discretion, and we will disturb the ruling only if it resulted from an abuse of discretion. *Riordan v. Riordan,* 252 S.W.2d 901, 902 (Ky.1952). There was no such abuse. Trial had already been continued multiple times—providing even more opportunity to secure

8. Kentucky Revised Statutes. KRS 625.090(1)(a)(3) addresses a parent convicted of a criminal abuse charge when more abuse is likely, but such was not at issue in our facts.

proof—and, CHFS even stipulated to some of the missing items. There simply are no grounds for reversal.

WHEREFORE, we affirm the judgment of the Fayette Circuit Court terminating W.L.C.'s parental rights to her daughter in Case No. 14–AD–00117.

### ORDER STRIKING AMENDED NOTICE OF APPEAL PERTAINING TO CASE NO. 14–AD–00118

■ On January 30, 2015, W.L.C. timely moved to appeal from the final judgment entered on December 30, 2014, in Case No. 2014–AD–00117—the case pertaining to her daughter. The judgment pertaining to her son, entered in Case No. 14–AD–00118, was not referenced in the notice, nor was L.R.C. named as an appellee.

W.L.C.'s counsel filed a timely notice of appeal in the Fayette Circuit Court identifying only the judgment in Case No. 14–AD–00117 and challenging only the trial court's ruling pertaining to her daughter. Appellees named in the notice of appeal were CHFS; the daughter; and, the daughter's biological father. W.L.C.'s son, L.R.C., was not named.

On February 16, 2015, through counsel, W.L.C. moved to file an amended notice of appeal adding her son's name and the judgment in her son's case to the matters being appealed. That motion was granted and entered by the trial court on February 25, 2015.

On April 28, 2015, this Court ordered W.L.C. to show cause why her amended notice of appeal should not be stricken. Our order noted filing an amended notice of appeal in the circuit court is governed by CR 73.02(1)(e)(ii), and *Flick v. Estate of Wittich*, 396 S.W.3d 816 (Ky.2013), addresses the circumstances in which this Court may allow amendment of a notice of appeal. Believing the current facts satisfied neither the rule nor *Flick*, this Court gave W.L.C. the opportunity to cite additional authority and explain why her amended notice of appeal had been properly filed in—and ultimately entered by—the circuit court. W.L.C. was also given the option of seeking a belated appeal.

W.L.C. responded to the show cause order on May 18, 2015, stating as follows:

1. Although only Circuit Court action 14–AD–117 was appealed, it was at all times the Appellant's intention to appeal the Circuit Court's orders in regards to both of her children.

2. The Notice of Appeal for 14–AD–117 indicated to all parties the Appellant's intention to appeal the Circuit Court's decision.

3. The Circuit Court's ruling for both children was announced from the bench after a single hearing was held on December 22, 2014, regarding both children.

4. The pursuance of the Termination of Parental Rights action regarding both children has proceeded in tandem from the outset of this matter and therefore none of the parties will be prejudiced by permitting 14–AD–118 to be appealed.

5. The facts, circumstances, and grounds for appeal are identical in both cases.

6. It is illogical to believe that a mother would intend to appeal the termination of her parental rights in regards to only one of her children.

7. A decision by this honorable Court that the Circuit Court's ruling was in error would yield an absurd result if the appeal for 14–AD–118 is not permitted to be pursued along with 14–AD–117; the mother's parental rights would be restored in regards to her daughter, but not her son.

8. As a matter of judicial economy, it is more expeditious for this Court to make a ruling in regards to W.L.C.'s parental rights to both her son and daughter in one proceeding.

[Emphasis added]. The response cited no legal authority, nor did it address this Court's query that the amended notice of appeal may have been improperly entered for multiple reasons, such as the trial court's loss of jurisdiction over a judgment ten days after its entry. CR 59.05. Perhaps even more curious, no motion for leave to file a belated appeal was filed, even though suggested in this Court's show cause order.

Much of what counsel said on W.L.C.'s behalf in the written response was true—separate cases involving each child traveled the same path simultaneously in the same court; separate, but similar, rulings were announced for each child by the trial court at the same time; and, the facts are identical for both children. That being said, we cannot simply read into a notice of appeal an "intention" or language that does not appear therein. This is especially true when CR 73.03(1) mandates in relevant part:

the notice of appeal shall specify by name all appellants and all appellees ("et al." and "etc." are not proper designation of parties) and shall identify the judgment, order or part thereof appealed from.

To do as W.L.C. requests—simply assume she intended to appeal both judgments—would start us down a slippery slope fraught with danger and for which there is no end in sight. This we are unwilling to do. We must consider not only this case, but the precedent we would establish for all future cases.

■ Here, we are presented with two children. They may be brother and sister, and their cases may have been handled together, but they are two separate people and their custody was decided in two separate judgments. A notice of appeal invokes the appellate jurisdiction of this Court. *Flick,* 396 S.W.3d at 819. Nothing contained within the original notice of appeal filed on W.L.C.'s behalf and mentioning only Case No. 14–AD–00117 gave anyone notice of a perceived error in Fayette Circuit Court Case No. 14–AD–00118. Furthermore, nothing within the original notice of appeal transferred jurisdiction over L.R.C., the boy named in Case No. 14–AD–00118, to this Court. Thus, any ruling we would make as to L.R.C. would be for naught.

■ Because there were two separate cases and two separate judgments, two separate notices of appeal should have been filed. While there may be no prejudice to CHFS, and we recognize W.L.C. will be denied an appeal of the TPR regarding her son through no fault of her own, we simply cannot overlook this error. We no longer require strict compliance with CR 73.02, but we do require substantial compliance, *Flick,* 396 S.W.3d at 819, and that did not occur here.

After receiving counsel's response to the show cause order, on August 20, 2015, a motion panel passed to this merits panel consideration of whether an appeal of Case No. 14–AD–00118 could proceed. Having now determined sufficient cause has not been demonstrated, we STRIKE the amended notice of appeal pertaining to the TPR order for L.R.C. W.L.C.'s attempt to join Fayette Circuit Case No. 14–AD–00118 to the current appeal is rejected.

Appellate practice is often characterized as a trap for the unwary. To minimize the opportunity for a misstep, we offer the following warning to the bar. When final disposition of an appeal is made by "Opinion and Order," as in this case, the party

adversely affected may move within ten days of entry for reconsideration as provided by CR 76.38(2), but a petition for rehearing is unauthorized.   CR 76.32(1).

ALL CONCUR.