RENDERED: AUGUST 18, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0530-DGE

COMMONWEALTH OF KENTUCKY,        APPELLANT
CABINET FOR HEALTH AND FAMILY
SERVICES

V.        ON REVIEW FROM COURT OF APPEALS
NOS. 2020-CA-0298, 2020-CA-0299,
2020-CA-0578 & 2020-CA-0579
JEFFERSON CIRCUIT COURT NOS. 17-J-504406,
17-J-504406-001 & 17-J-504406-002

L.G.; H.M.; AND J.M.        APPELLEES

AND

2021-SC-0533-DGE

J.M.        APPELLANT

V.        ON REVIEW FROM COURT OF APPEALS
NOS. 2020-CA-0298, 2020-CA-0299,
2020-CA-0578 & 2020-CA-0579
JEFFERSON CIRCUIT COURT NOS. 17-J-504406,
17-J-504406-001 & 17-J-504406-002

L.G.; G.M.; H.M.; COMMONWEALTH OF
KENTUCKY, CABINET FOR HEALTH AND
FAMILY SERVICES; AND JEFFERSON
COUNTY ATTORNEY        APPELLEES

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>REVERSING AND REINSTATING</u>**

The Jefferson Family Court found that L.G. emotionally abused her son, H.M. L.G. appealed, naming both the Cabinet for Health and Family Services (the Cabinet) and J.M., the father, as appellees. The Court of Appeals reversed. Both the Cabinet and J.M. appealed separately to this Court. This Court granted discretionary review of both cases and now consider the two appeals concurrently within this Opinion. For the reasons stated below, we reverse the Court of Appeals and reinstate the orders of the family court.

## I.  BACKGROUND

J.M. and L.G. married in 2004. In 2007, they had a son, H.M. The couple divorced in 2009, originally agreeing to an equal-time parenting arrangement negotiated through their Marital Settlement Agreement. In April of 2012, when H.M. was five years old, Child Protective Services (CPS) received a report that J.M. had sexually abused H.M. L.G. filed a petition for protection with the Jefferson Family Court. Shortly after, during an investigation into the first claim, L.G. reported that J.M. threatened H.M. Although an emergency Domestic Violence Protective Order (DVO/EPO) was granted pending a hearing on the underlying allegations, the family court ultimately determined that the facts underlying L.G.'s pursuit of a DVO/EPO had not been proven. That case was dismissed in July of 2012. Soon after, CPS formally unsubstantiated both reports against J.M.

L.G. filed a second petition for a DVO/EPO against J.M. in October of 2012 alleging another instance of sexual abuse. The Jefferson Family Court again found that any claims that J.M. had sexually abused his son, H.M., were

2

unproven. The court denied L.G.'s motion for a DVO/EPO and dismissed the case, clearing J.M. "of all wrongdoing." During the pendency of the first three allegations, J.M. had restricted access to H.M. J.M. and H.M. then went through reunification therapy. On January 30, 2014, the court re-established the parents' equal-time custody agreement.

L.G. filed a fourth report with CPS in October of 2017. The allegation was, again, that J.M. had sexually abused H.M. CPS initiated an investigation into J.M. for the alleged abuse. While investigating that allegation, CPS initiated a separate investigation against L.G. for emotional abuse of H.M. CPS worried that L.G. was manipulating H.M. into making and supporting false claims against his father and using the allegations to get back at J.M. after arguments. For example, each of the allegations of abuse followed an argument between the two parents: the first allegation followed a dispute over where H.M. would spend Derby weekend (with L.G. saying she would get H.M. even if she had to "call C.P.S."); the second allegation was made during the pendency of the first DVO/EPO action between the parties; the third allegation followed an argument over visitation; and the fourth allegation followed a disagreement between the parents about whether H.M. should continue playing football.

This timing, paired with H.M.'s behavior during CPS's first three investigations, caused the Cabinet to become concerned. During investigations into each of the allegations, H.M. gave largely identical, limited descriptions of what had happened. Often, his explanations were contradicted by other facts; H.M. would thereafter attempt to correct himself when confronted with those

3

contradictions or claim not to remember. CPS accordingly never substantiated the first three allegations of sexual abuse. Following the initiation of CPS's fourth investigation into J.M. and first investigation into L.G., the Cabinet for Health and Family Services (the Cabinet) moved the Jefferson Family Court for a psychological assessment of H.M. At that time, the Cabinet was considering whether his removal from L.G. would be appropriate. The family court ordered an evaluation of H.M. by Dr. Berlá, a licensed psychologist. In addition to interviewing H.M., Dr. Berlá spoke to H.M.'s former treatment professionals and reviewed 40 other external reports and records regarding H.M. and L.G. Following her evaluation, Dr. Berlá ultimately opined that L.G. had emotionally abused H.M. During this time, CPS deemed H.M.'s fourth allegation credible. Following these results, the Cabinet filed two petitions with Jefferson Family Court: one against L.G. for emotional abuse, and one against J.M. for sexual abuse.[1] The family court took up both petitions simultaneously.

At the adjudication hearing on the two petitions, the Jefferson Family Court heard testimony from J.M., L.G., two social service workers (SSWs), both stepparents, H.M.'s visitation supervisor, H.M.'s teacher, and psychology professionals Dr. Berlá, Dr. Tabashneck, Dr. Eisenmenger, and Leanne Gardner, M.A. H.M. testified in chambers. The trial court received reports and records from Dr. Berlá, Dr. Tabashneck, Dr. Crumbo, and Ms. Gardner. Of

---

[1] We acknowledge that the two petitions seem contradictory. It appears that the Cabinet's investigation ran on two separate tracks conducted by separate social service workers, resulting in two different petitions.

4

note, Dr. Berlá's court-ordered evaluation and resulting report received considerable attention at trial and were explored further through Dr. Berlá's testimony. Although L.G. moved to strike Dr. Berlá's report and testimony through a *Daubert* motion, that motion was denied.

Dr. Berlá testified that L.G. had "contaminated" H.M.'s relationships with mental health professionals and his relationship with his father. Dr. Berlá further testified that H.M. was constantly worried that a therapist would tell his mom about things he said or did not say,[2] that he believed he would be in trouble if he did not tell CPS the right thing, and that he had been diagnosed by other professionals as having dysgraphia, ADHD, and an anxious/depressive adjustment disorder. Dr. Berlá expressed her worry that because L.G. both modeled manipulative behavior and rewarded H.M. with praise and gifts every time he made an allegation against J.M. (gifting him an iPhone X, a puppy, and a ride in a limousine, for example), H.M. had learned to lie and manipulate for his mother. Although Dr. Berlá revealed in testimony that she did not review any school sources,[3] it was her expert opinion that the extensive evidence of H.M.'s learned maladaptive behaviors and L.G.'s inappropriate, harmful conduct was sufficient to prove emotional injury. This belief is echoed in her report, in which she states:

---

[2] For example, in one such session in which H.M. did not mention abuse, H.M. told his therapist "not to tell his mother that he hadn't because she would get mad."

[3] Dr. Berlá did not review said sources, despite collecting them, because the evidence had "already met the threshold" for emotional abuse, and she did not see the value in further investigation.

There is ample evidence that [L.G.] engaged in persistent behaviors that, at best, confounded the ability of investigators and treatment providers to properly assess and/or intervene in alleged sexual abuse of [H.M.], or, at worst, induced [H.M.] to manufacture false allegations against his father. Additionally, [H.M.'s] relationship with his father and his capacity to obtain reasonable parenting from his father has been persistently and substantially damaged.

Dr. Berlá's report detailed this "ample evidence." Dr. Berlá wrote that L.G., in addition to "systematically endeavor[ing]" to remove anyone (especially therapeutic professionals) from H.M.'s life who did not agree with her, "failed to protect [H.M.] from exposure to inappropriate information about his father and the case, has subjected [H.M.] to overt negative messages about his father, and has positioned [H.M.] to have to reject his father in order to preserve his relationship with her." Dr. Berlá went on to describe several instances of H.M.'s dishonesty, troubling emotional outbursts from L.G. and their effect on H.M., and H.M.'s vitriolic behavior around his father in supervised visits. As to the latter, therapists reported that at times H.M. requested more time with his father, showed no fear, and was playful and affectionate with him. At other times, however, H.M. threw tantrums, refused to cooperate, and acted out toward his father. Dr. Berlá expressly underscored the emotional injury caused by L.G. on the above facts and others, stating:

[H.M.] demonstrates marked impairment in his relationship with his father. If the abuse allegations are false, [H.M.] has suffered incalculable damage to his psyche, and will require significant therapeutic work to regain healthy emotional function. Even if the allegations are true, [H.M.] still has suffered severe damage to his potential to adequately and appropriately work through the psychological and emotional tasks that lay before him.

6

Following the adjudication hearing, the family court entered an order thoroughly detailing the evidence provided by each party and its assessment of the credibility of those testifying. The family court was particularly persuaded by the testimony and report of Dr. Berlá. By contrast, the family court found L.G. and H.M. to lack credibility. After an exhaustive analysis of each witness's statements and credibility, the family court concluded that L.G. had emotionally injured H.M. The family court's order read in relevant part:

> Further, [L.G.] denied coaching [H.M.] in any way. However, the Court's own observations of [H.M.] were that he was influenced by his mother. The experts observed in his early reporting he was aware of things a child his age would not have knowledge of unless these things were relayed to him. The Court notes that regardless of the evidence put in front of her, such as travel logs and the testimony of psychological professionals, [L.G.] does not sway from her position. In assessing [L.G.'s] credibility, the Court not only considered its own observations, but also the input from the psychological professionals involved with this family and the past Court determinations.
>
> The court found the testimony of [H.M.'s stepfather,] [T.G.] confirmed the timing of the allegation arising just as [J.M.] made it known he did not want [H.M.] to play football next year. The Court believes [T.G.] was a pawn used by [H.M.] to try to manipulate the situation to get his way and be able to play football.
>
> . . .
>
> With regard to [H.M.'s] testimony, the Court did not find his allegations of sexual abuse against his father to be credible. There was substantial inconsistency in [H.M.'s] reports with regard to when the abuse happened and how often. According to [the CPS investigator,] Mr. Hogan, [H.M.] reported to [T.G.] the abuse occurred 182 days prior but then to Mr. Hogan [H.M.] reported the occurrence one month prior. In testimony, the Court understood [H.M.] to state that the abuse had never stopped but occurred regularly over the years. Yet, when pressed for detail [H.M. offered little]. He said the abuse was the same every time. Curiously, if his allegation is that all the past allegations were true, he did not mention any of the fantastical detail documented in [L.G.'s] past

7

EPO/DVO petitions such as his father wearing a fish mask during the abuse and there being a "pictureman" in the room who took pictures of him naked.

The Court was concerned by [H.M.'s] response to questions regarding his conversation about children telling lies with Leanne Gardner. The Court did not find this explanation credible and believes the question to be telling of the child's internal struggle with the false allegations he had made.

The Court also found the timing of the allegations to be telling.

. . .

The Court placed great weight in the testimony of Leanne Gardner, MA, and Dr. Berlá. Both expressed concerns that [H.M.'s] discussions of the alleged sexual abuse were without affect, lacking in detail, and rote, each of which caused them to question the veracity of the allegations. In her time with [H.M.], Leanne Gardner did not suspect [H.M.] to be an abused child. [H.M.] never mentioned abuse to Ms. Gardner until 2017, nearly three years into his therapy. The Court found Ms. Gardner's testimony regarding [H.M.'s] affect and language usage in comparison to a typical abuse victim to be important. Further, the Court found the questions [H.M.] posed to Ms. Gardner about his treatment and cost, to be very telling on the boundaries between he [sic] and [L.G.]. All of these inconsistencies and inabilities were testified to by the experts in this case as uncommon for a child who had actually been sexually abused.

The Court also placed great weight on Dr. Berlá's testimony and Report. Dr. Berlá's Report encompassed vast amounts of information upon which this Court has relied but could not possibly cite in total. As noted above, the Court weighed Dr. Berlá's qualifications and testimony against that of Dr. Tabashneck and determined Dr. Berlá's testimony to be credible and her expertise reliable. *The Court agrees with her conclusions that [L.G.'s] behavior was damaging to the child. The evidence that [L.G.] interfered with the child's therapeutic relationships, either directly or indirectly coached [H.M.], and simply refused to accept the multiple conclusions that [J.M.] has not harmed [H.M.] is undeniable. [L.G.'s] inability to control her emotions and unwillingness to allow [H.M.] to form his own opinion of [J.M.] has substantially harmed the child's relationship with his father and this is no doubt emotional harm.*

8

The Court also believes the child's teacher, Suzanne Noland, was used as a pawn by [H.M.]. [H.M.] is old enough, and has, unfortunately, been exposed to the methods and schemes of [L.G.] long enough, to have learned how to get attention and manipulate situations to his liking. The Court believes [H.M.] used the "Speak Up, Be Safe" campaign to start the allegations all over again as this conflict over football was inevitably brewing.

(Emphasis added). As noted, the family court accordingly found that L.G. "emotionally injured [H.M.], and that, by doing so, she has seriously endangered [H.M.'s] emotional stability." The family court found that the Cabinet did not, however, meet its burden to prove that J.M. had abused H.M. H.M. was then removed from L.G.'s custody, and the family court ordered that L.G.'s visitation be limited to therapeutic visits. H.M. was ordered to be returned to his father's custody.

L.G. appealed the final orders of the trial court. On appeal, L.G. argued, among other things, that the trial court abused its discretion in finding emotional injury amounting to abuse. Relying on this Court's decision in *M.C. v. Cabinet for Health & Family Services*, 614 S.W.3d 915 (Ky. 2021), the Court of Appeals reversed the family court and remanded for further proceedings. The Cabinet moved for discretionary review by this Court. Soon after, J.M. also moved for discretionary review by this Court. We granted both motions. We consider each of their independent appeals concurrently.

## II.    ANALYSIS

In separate appeals to this Court, the Cabinet and J.M. both argue that the Court of Appeals erred in reversing the Jefferson Family Court's decision that L.G. emotionally abused H.M. L.G. disagrees and further contends that the

9

trial court erred in refusing to exclude Dr. Berlá's opinions, that J.M. lacked

standing to prosecute the Cabinet's DNA (Dependency, Neglect, or Abuse)

petition against L.G., and that the Family Court abused its discretion in

removing custody from L.G. We first address the issue of emotional injury.

*A.      Emotional Injury*

The family court determined that L.G. emotionally abused H.M. in the

context of a DNA action. Kentucky Revised Statute (KRS) 600.020(1)(a)1 defines

an abused and neglected child as

> a child whose health or welfare is harmed or threatened with harm
> when . . . [h]is or her parent, guardian . . . [i]nflicts or allows to be
> inflicted upon the child physical or emotional injury as defined in
> this section by other than accidental means[.]

KRS 600.020(26) defines "emotional injury" as

> an injury to the mental or psychological capacity or emotional
> stability of a child as evidenced by a substantial and observable
> impairment in the child's ability to function within a normal range
> of performance and behavior with due regard to his or her age,
> development, culture, and environment as testified to by a qualified
> mental health professional[.]

A finding of emotional injury is within the discretion of the family court. *M.C.*,

614 S.W.3d at 921. We review that finding for an abuse of discretion. *Id.* As

such, the family court's findings of fact are only set aside when they are clearly

erroneous. *Id.* As this Court explained in *M.C.*,

> A finding of fact is clearly erroneous if it is not supported by
> substantial evidence, which is evidence sufficient to induce
> conviction in the mind of a reasonable person. If the family court's
> findings of fact were supported by substantial evidence, and it
> applied the correct law, its decision will not be disturbed absent an
> abuse of discretion. An abuse of discretion occurs when the family
> court's decision is unreasonable or unfair. Thus, in reviewing the
> decision of the family court, the test is not whether the appellate

10

court would have decided it differently, but whether the findings of the family court are clearly erroneous, whether it applied the correct law, or whether it abused its discretion.

*Id.* (internal quotation marks and citations omitted). "Substantial evidence has been defined as some evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable people." *Cabinet for Health & Fam. Servs. ex rel. C.R. v. C.B.*, 556 S.W.3d 568, 574 (Ky. 2018) (citing *Smyzer v. B.F. Goodrich Chem. Co.*, 474 S.W.2d 367, 369 (Ky. 1971)).

Substantial evidence of emotional injury takes different forms. In *Cabinet for Health & Family Services ex rel. C.R. v. C.B.*, we affirmed the trial court's finding of neglect from a risk of physical and emotional injury based on evidence of "C.B.'s drug issues" which were "still not resolved." 556 S.W.3d at 576. In *Cabinet for Health & Family Services v. P.W.*, we held that the trial court's finding of a risk of emotional injury was supported by substantial evidence that domestic violence was likely occurring in the home in view of the children. 582 S.W.3d 887, 896–97 (Ky. 2019). In each of these cases, the Court deferred to the factual findings of the trial court. As the factfinder, it is the trial court's prerogative to make findings of fact according to its own weighing of the evidence.

In the case at bar, the Court of Appeals impermissibly substituted its own findings for the family court's and thus found an abuse of discretion. In so holding, the Court of Appeals conducted its own weighing and interpretation of the evidence. Given that Dr. Berlá's report constituted "evidence of substance and relevant consequence, having the fitness to induce conviction in the minds

11

of reasonable people," the Court of Appeals was wrong to find, on its own, that a different doctor's testimony was more relevant and reliable. *C.B.*, 556 S.W.3d at 574 (citing *Smyzer*, 474 S.W.2d at 369).

This Court recently considered the sufficiency of evidence of emotional injury in *M.C.* 614 S.W.3d 915. There, the Cabinet filed a DNA petition against the father of three children. *Id.* at 917. The father in that case, M.C., was party to a case plan with the Cabinet under which he agreed to attend A.A. meetings, not let his children have unsupervised visits with their grandmother, and "not be under the influence of alcohol while in a caretaking role or in the presence of the children." *Id.* at 918. Soon after taking full custody, M.C. began drinking again. *Id.* at 919. However, M.C. never drank in front of the children and always drank on the porch and only in the evenings. *Id.* The social service worker (SSW) assigned to M.C.'s case filed a DNA petition after being told about M.C.'s drinking. *Id.* at 918–19.

While investigating, the SSW found that "the children were not missing any school while in M.C.'s care, that they have always excelled in school," and that although two of the children "[were] not bothered" by their father's drinking, it upset M.C.'s daughter and sometimes led to arguments between the daughter and M.C. *Id.* at 919. Ultimately, the SSW "did not observe anything in the home that was a threat to the children's health or well-being." *Id.* at 920.

The evidence indicated that the only negative impact of M.C.'s drinking was that it sometimes bothered one of the three children. *Id.* at 919–20. The

family court therefore found that M.C. was neglecting his children by violating the terms of his case plan and drinking. *Id.* The Court of Appeals affirmed. *Id.* This Court reversed and vacated the family court's finding of neglect. *Id.* The Cabinet bore a burden to show, by a preponderance of the evidence, that M.C. neglected his children; "in other words, that it was more likely than not that they were neglected." *Id.* at 921 (citations omitted). The Cabinet failed to meet that burden. *Id.* at 926. "The evidence was uncontroverted that M.C. was providing appropriate care to his children. . . . [The SSW] saw nothing in the home that was a threat to the children's health or well-being." *Id.* at 924.

In *M.C.*, we made clear that "we simply cannot affirm a finding of neglect when there has been no harm or actual, reasonable risk of harm to a child." *Id.* at 929. While we support that holding, the Court of Appeals' application of it in the case at bar was improper. The facts underlying this case are a far cry from the unbased allegation of neglect in *M.C.* Here, the family court heard and received numerous claims regarding the ways in which L.G.'s behavior served to impair H.M. *See* KRS 600.020(26). The trial court found that H.M. was deprived of his ability to have a stable and appropriate relationship with his father and was encouraged to deceive and manipulate those around him. L.G. intentionally impeded any attempts to remedy these harms in H.M.'s therapy, only worsening his ability to overcome deficits in his ability to "function within a normal range of performance and behavior." *Id.* Certainly, not being able to tell the truth to authority figures or have a relationship with his father not

13

marred by reactive allegations of serious crimes constitutes abnormal performance and behavior for H.M.'s age and development.

Under our standard of review, "an appellate court is obligated to give a great deal of deference to the trial court's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them." *D.G.R. v. Commonwealth, Cabinet for Health & Fam. Servs.*, 364 S.W.3d 106, 113 (Ky. 2012) (citations omitted). The evidence from Dr. Berlá's report constituted "some evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable people" to support the family court's findings. *C.B.*, 556 S.W.3d at 574 (citing *Smyzer*, 474 S.W.2d at 369). The report detailing H.M.'s erratic behavior with his father, H.M.'s manipulative behavior, and L.G.'s inappropriate conduct constituted substantial evidence of the impairment to H.M.'s ability to have normal relationships with mental health professionals and his father. The impairment was so severe according to Dr. Berlá that she found it would take years of serious treatment to restore H.M. to normal functioning.

Accordingly, the family court's findings were not clearly erroneous. It was not unfair or unreasonable for the family court to conclude, based on that substantial evidence, that H.M. was emotionally injured by L.G. *See M.C.*, 614 S.W.3d at 921. We therefore reverse the Court of Appeals and affirm the family court's determination that L.G. abused H.M. by causing emotional injury.

14

*B.      L.G.'s Remaining Arguments*

Because the Court of Appeals made its decision to reverse the family court solely on L.G.'s argument that the family court lacked substantial evidence of emotional injury, it did not address L.G.'s remaining arguments. L.G. raises those issues again to this Court. "[W]e need not remand this case to the Court of Appeals because we are equally suited to determine the sufficiency of the evidence based on a closed record as the Court of Appeals would be." *Dept. for Cmty. Based Servs., Cabinet for Health & Fam. Servs. v. Baker*, 613 S.W.3d 1, 6 (Ky. 2020). Thus, "a remand would exact the significant cost of further delay for little benefit," something to which this Court is sensitive on this expedited review. *Id.* at 6–7. Accordingly, we consider each of L.G.'s remaining arguments in turn.

First, L.G. argues, as she did to the Court of Appeals, that the family court erred by admitting Dr. Berlá's testimony and report over a *Daubert* motion to exclude her. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The family court found Dr. Berlá's testimony to be reliable and relevant to the issue of emotional injury. *See* KRE 702. In fact, Dr. Berlá was selected by the family court itself and ordered to conduct H.M.'s evaluation. "The decisions of trial courts as to the admissibility of expert witness testimony under *Daubert* are generally entitled to deference on appeal because trial courts are in the best position to evaluate first hand the proposed evidence." *Miller v. Eldridge*, 146 S.W.3d 909, 914 (Ky. 2004). *Daubert*'s requirements were codified in Kentucky Rule of Evidence (KRE) 702, which states:

15

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
> (2) The testimony is the product of reliable principles and methods; and
> (3) The witness has applied the principles and methods reliably to the facts of the case.

Here, Dr. Berlá based her report on an extensive list of reports and interviews, as well as interviews she conducted herself of relevant parties. Dr. Berlá testified regarding her principles and methodology at trial using guidelines from her practice and her years of experience in child psychology. Finally, Dr. Berlá's report clearly shows her application of child psychology principles and expertise to the facts of the case. Because she satisfied each of the elements of KRE 702, the family court did not abuse its discretion in denying L.G.'s motion to exclude Dr. Berlá's testimony.

Second, L.G. argues that J.M. lacked standing to "prosecute" the DNA petition against L.G. She argues that the Cabinet "gave over its prosecution" to J.M.'s counsel. This argument lacks merit. This Court can find no evidence that the Cabinet turned its case over to J.M.; instead, L.G. seems to argue that J.M. acted to prosecute the DNA petition by being afforded the ability by the trial court to question Dr. Berlá first of the four parties at trial. As such, L.G.'s argument fails to go to the issue of standing and instead pertains to the family court's discretion in the administration of justice within the courtroom. "A court has inherent authority to ensure that it functions efficiently and

16

effectively to provide the fair administration of justice and to control its docket with economy of time and effort." *Kentucky Bar Ass'n v. Blum*, 404 S.W.3d 841, 848 (Ky. 2013). Here, the family court agreed to permit J.M.'s counsel to question Dr. Berlá first in the interest of efficiency. This Court cannot hold that the decision to alter the order of questioning, absent any other evidence of harm or unfairness, is an abuse of discretion.

Finally, L.G. claims that the family court abused its discretion in removing H.M. from L.G.'s custody, arguing that the decision was too severe and caused distress to H.M. L.G. offers no legal basis for this argument aside from the severity of the sadness it has caused H.M. However, Dr. Crumbo stated that *any* change to H.M.'s ability to see his mother would cause him distress, and the family court did not go so far as to order no contact between L.G. and H.M. As such, we cannot conclude that the trial court abused its discretion in ordering that H.M. be removed from L.G.'s custody.

### III.   CONCLUSION

The family court was not clearly erroneous and did not abuse its discretion in finding that L.G. emotionally injured H.M., thus finding abuse and removing H.M. from L.G.'s custody. Therefore, in both appeals, we reverse the decision of the Court of Appeals and reinstate the orders of the trial court.

All sitting. All concur.

17

COUNSEL FOR APPELLANT/APPELLEE, COMMONWEALTH OF KENTUCKY:

Daniel J. Cameron
Attorney General of Kentucky

Michael J. O'Connell
Jefferson County Attorney

David Andrew Sexton
Special Assistant Attorney General/Assistant Jefferson County Attorney

Elizabeth Ann Duncan
Ingrid Lea Federspiel
Assistant Jefferson County Attorney

David Martin Feldkamp
COUNSEL FOR APPELLANT/APPELLEE, J.M.:

William David Tingley
Hillary Ann Hunt
Graydon Head & Ritchey, LLP

COUNSEL FOR APPELLEE, L.G.:

John Harold Helmers, Jr.
Helmers & Associates

Kevin Crosby Burke
Jamie Kristin Neal
Burke Neal PLLC

COUNSEL FOR APPELLEE, G.M.:

Sarah Eleanor Clay
Clay Law Office, PLLC

COUNSEL FOR APPELLEE, H.M.:

Pashens L. Fitzpatrick
Fitzpatrick Law Office

COUNSEL FOR APPELLANT/APPELLEE, CABINET FOR HEALTH AND FAMILY
SERVICES:

Jennifer Ellen Clay
CHFS Office of Legal Services