NICKELL, JUDGE:
K.M.E. ("Father") is the putative father of K.H.J.W. ("Son"), born July 17, 2007, and K.D.W. ("Daughter"), born June 17, 2008. Father challenges orders and judgments entered in two cases by the Jefferson Circuit Court, Family Division, ordering involuntary TPR and awarding custody of children to the Cabinet for Health and Family Services ("CHFS") with authorization to place them for adoption. We will consider two of the three issues raised by Father-whether CHFS proved statutory grounds justifying TPR and whether CHFS made reasonable efforts to reunite the family. A third issue, seeking reconsideration of A.C. v. Cabinet for Health and Family Services, 362 S.W.3d 361 (Ky. App. 2012) ($500 maximum fee for attorney representing indigent parent through completion of case which includes appeal), is not properly before us and will not be considered. Following review of the record, briefs and law, we affirm.
FACTS AND PROCEDURAL BACKGROUND
Son and Daughter were originally placed with Father following a temporary removal hearing on August 8, 2013, occasioned by the filing of a petition alleging substance abuse by L.S.E.W., the children's biological mother ("Mother").[2] On October 31, 2013, the children were deemed abused and neglected based on Mother stipulating her drug usage placed the children at risk.
Around January 12, 2016, Father called the CHFS hotline stating he wanted to relinquish custody of the children because they were out of control. He described the children as stealing food and candy-both of which he said they could have had on request. He also claimed the children were stealing alcohol, watching pornography on the computer and bullying other children. Father stated the children did not want to live in his home and he could not handle them due to his and his wife's health issues.
Emergency custody petition filed in early March 2016 alleging Father physically abused Daughter by whipping her with paint sticks wrapped in duct tape, leaving significant bruising on the child's right forearm, left wrist, and lower back. Father stipulated his use of "inappropriate corporal punishment" in writing, prompting trial court to find Father abused or neglected his children, remove Son and Daughter from Father's home, and give temporary custody of both children to CHFS where they have remained since June 2016. Order of disposition required Father to pay child support, cooperate with CHFS and actively participate in treatment and social service programs. According to Angela Swartz, the family's second caseworker,[3] since the children entered state custody, Father has paid no child support and has provided no parental care or protection to either child. Swartz also stated she had no reason to believe Father would change his ways in a reasonable amount of time given the ages of his children. Swartz expressed concern Father could not discipline the children without using corporal punishment. The March 2016 petition, and the single-day trial convened on October 4, 2017, form the basis of these appeals.
*652 At trial, Sarah Herzog-a licensed professional counselor associate and qualified mental health professional-testified she became Daughter's therapist in March 2016. Herzog testified Daughter has been diagnosed with adjustment disorder and oppositional defiance, both of which she exhibits through tantrums, not listening, and not following directions. Herzog testified she became Son's therapist in May 2016. Son has been diagnosed with adjustment disorder, oppositional defiance and post-traumatic stress disorder. He exhibits aggression, anger and physical fighting at school. Both Son and Daughter take medication for mental health issues.
Herzog used behavior modification, cognitive interventions, play and expressive therapy with the children. Both children improved over time and she views their prognosis as good with consistent parental oversight. She considered adoption to be an appropriate goal. On April 27, 2017, the trial court approved a CHFS petition to change the permanency goal to adoption.
Herzog directed one family therapy session in late May 2016. Attended by Son, Daughter, and Father, the session went well until Father announced he was relocating to Michigan within the week. In the wake of Father's revelation, the focus of the session shifted to helping the children process Father's imminent departure. Father relocated to Michigan as of May 29, 2016, ending Herzog's contact with him.
Herzog continued working with the children until April 2017, and again from September 2017 through November 2017. Herzog testified she is familiar with the children's foster family which is addressing the children's medical, mental, and emotional needs. Herzog evinced concern about lingering harm and neglect from the initial referral.
According to Swartz, reunification services ordered for Father included: attend abusive parenting classes; participate in supervised visitation; cooperate with CHFS; submit to random drug screens; and, complete a substance abuse assessment after any positive drug test. In describing Father's compliance, Swartz testified he submitted to some drug screens. According to the trial court's findings of fact, Father tested positive for marijuana, but failed to complete the substance abuse assessment. Swartz referred Father to abusive parenting classes at Centerstone Transitions where he attended only two classes-on April 18 and 25, 2016, before being discharged from the program. Via letter to Sisson, Amy Noll, Principal Therapist/Supervisor at the Transitions Unit of Seven Counties Services, Inc., described Father's performance in those classes.
During each of those sessions [Father] reported that he did spank his daughter but denied that this was abusive in any way. [Father] was offered the opportunity to complete the accountability statement (statement describing the incident and how it was abusive) and a follow up appointment but he declined.
Transition's Parenting After Abuse Group is based on the parent's ability to take responsibility for the behaviors that led to the injury to their child. [Father] has denied responsibility for any physical abuse to the child. Therefore, he does not meet the criteria for our program at this time. To meet the criteria for the recommended treatment, [Father] will need to be able to discuss the abusive incident and the impact of the abuse on his child.
After moving to Michigan, Father routinely telephoned the children in Kentucky and regularly communicated with Swartz. He also completed nurturing parenting *653 classes in Michigan,[4] knowing they did not qualify as the court-mandated abusive parenting classes. Paperwork from Sisson indicates Father was told it was fine to take the nurturing parenting classes in Michigan, but they would not substitute for the court-ordered abusive parenting classes.
On May 4, 2017, CHFS filed TPR petitions for both children naming both parents. Citing KRS[5] 625.090(2)(a), (e), and (g), CHFS petitioned for termination of Father's rights on three grounds-abandonment, failure/inability to provide essential care and protection to the children for not less than six months, and failure/inability to provide "essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being" without reasonable expectation of improvement.
Father returned to Kentucky in early August 2017 to avoid TPR and work his case plan, remaining in the Commonwealth about one month. During that month he resumed working in Kentucky, underwent more drug screens, and participated in two supervised visits with his children.
During cross-examination of Swartz, Father's attorney asked what alternatives CHFS offered Father to satisfy the abusive parenting program requirement when he was discharged from Centerstone. Swartz indicated no alternative was offered because the court had specifically ordered completion of the abusive parenting class which requires execution of an accountability statement. When Father's counsel described this as a "Catch 22," the trial court interrupted, stating counsel had posed an inappropriate question and was attempting to impose a nonexistent requirement on CHFS. The trial court explained from the bench:
he was court-ordered to go to abusive parenting because there was a stipulation ... there was a reason he was ordered into abusive parenting. If he says he can't go because he's not gonna admit it, then he's not admit.... You know, I can't help you with something if you don't admit you've got a problem.... And I don't think it's their job to come up with an alternative in a case like that.
Father quit his job in Kentucky and returned to Michigan again in early September 2017. He did so to avoid further jeopardizing the Section 8 housing stipend[6] his current wife, E.E., had secured. While in Michigan, Father telephoned his children, took random drug screens, and secured a job as a cook at Buffalo Wild Wings.
Due to Father's relocation to Michigan, CHFS requested an Interstate Compact Placement of Children ("ICPC") evaluation.[7] An ICPC assessor denied the potential placement in Michigan because Father's *654 home had insufficient bedrooms; Father could neither add tenants to the current lease nor move to a larger unit for at least a year; E.E.-who is disabled by multiple sclerosis-doubted she could care for the children while Father was at work due to the children's behavior; the children disrespect E.E. causing her stress; Father believed his children respond only to corporal punishment and doubted timeout and other interventions he had learned in the nurturing parenting classes would adequately discipline them; and, there was insufficient household income to support the children. The report states, "[n]o one in the household works" and "[Father] is currently unemployed."
Swartz testified since phoning the CHFS hotline in January 2016, Father had stated he wants custody of his children. In spite of his stated desire to regain custody, he had no plan for adequate housing, schooling, or childcare for his children in the event they were returned to him.
According to Father's brief, he and E.E. testified. The trial court confirmed both were witnesses, but we cannot independently verify the content of their testimony because it is not part of the record certified on appeal.[8] "It is the appellant's duty to present a complete record on appeal." Steel Techs., Inc. v. Congleton , 234 S.W.3d 920, 926 (Ky. 2007), abrogated by Osborne v. Keeney , 399 S.W.3d 1 (Ky. 2012). "It has long been held that, when the complete record is not before the appellate court, that court must assume that the omitted record supports the decision of the trial court." Commonwealth v. Thompson , 697 S.W.2d 143, 145 (Ky. 1985).
On November 29, 2017, the trial court entered orders finding TPR as to Father was in the best interest of Son and Daughter and appropriate due to CHFS establishing three grounds under KRS 625.090(2) by clear and convincing proof. TPR was ordered and custody awarded to CHFS. Father appeals as to both children.
COMPLIANCE WITH RULES OF APPELLATE PRACTICE
We begin by commenting on the proper structure of an appellate brief and the importance of preservation. CR[9] 76.12(4)(c)(v) requires each argument in the brief for appellant to begin with a statement of preservation referencing "the record showing whether the issue was properly preserved for review and, if so, in what manner." The same rule also requires each argument to contain "ample supportive references to the record and citations of authority pertinent to each issue of law[.]" Id. Father's brief contains no statement of preservation for any issue raised. His first two arguments each contain one citation to the video record, neither of which accurately reflects the record certified to us. His third argument contains no citation to the record whatsoever and is not mentioned in the trial court's orders or findings of fact and conclusions of law, leading us to suspect no request for reconsideration of A.C. was raised in the trial court-a fact confirmed by CHFS in its brief.
Father's statement of the case contains many references to the record as required by CR 76.12(4)(c)(iv). However, those references do not link the facts to the arguments and applicable case law, nor do they *655 tell us where the trial court was given the opportunity to correct the errors of which he now complains, a critical piece of information because "a party may not raise an issue for the first time on appeal." Taylor v. Kentucky Unemployment Ins. Com'n , 382 S.W.3d 826, 835 (Ky. 2012) (citations omitted). It is dangerous for counsel to ignore the rules of appellate procedure, especially when a client's parental rights hang in the balance.
We have three options: "(1) to ignore the deficiency and proceed with the review; (2) to strike the brief or its offending portions; or (3) to review the issues raised in the brief for manifest injustice only." Hallis v. Hallis , 328 S.W.3d 694, 696 (Ky. App. 2010) (citing Elwell v. Stone , 799 S.W.2d 46, 48 (Ky. App. 1990) ). Because these errors were made by counsel, we will not punish the client. We will review two of the alleged deficiencies as best we can-but warn counsel the Court may not be so lenient in the future. The rules are "lights and buoys to mark the channels of safe passage and assure an expeditious voyage to the right destination. Their importance simply cannot be disdained or denigrated." Louisville and Jefferson County Metropolitan Sewer Dist. v. Bischoff , 248 S.W.3d 533, 536 (Ky. 2007) (quoting Brown v. Commonwealth , 551 S.W.2d 557, 559 (Ky. 1977) ).
LEGAL ANALYSIS
To begin, we note that the trial court has wide discretion in terminating parental rights. Cabinet for Health and Family Services v. T.N.H. , 302 S.W.3d 658, 663 (Ky. 2010) (citing K.R.L. v. P.A.C. , 210 S.W.3d 183, 187 (Ky. App. 2006) ). Thus, our review is limited to a clearly erroneous standard which focuses on whether the family court's order of termination was based on clear and convincing evidence. Kentucky Rules of Civil Procedure ("CR") 52.01. "Pursuant to this standard, an appellate court is obligated to give a great deal of deference to the family court's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them." T.N.H. , 302 S.W.3d at 663. Due to the fact that "termination decisions are so factually sensitive, appellate courts are generally loathe to reverse them, regardless of the outcome." D.G.R. [v. Com., Cabinet for Health and Family Services ,] 364 S.W.3d [106,] 113 [ (Ky. 2012) ].
Cabinet for Health and Family Services v. K.H. , 423 S.W.3d 204, 211 (Ky. 2014).
"Substantial evidence has been conclusively defined by Kentucky courts as that which, when taken alone or in light of all the evidence, has sufficient probative value to induce conviction in the mind of a reasonable person." Bowling v. Natural Resources & Environmental Protection Cabinet , 891 S.W.2d 406, 409 (Ky. App. 1994). "Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent minded people." Rowland v. Holt , 253 Ky. 718, 70 S.W.2d 5, 9 (1934). With these standards in mind, we turn to the case at bar.
Involuntary TPR is governed by KRS 625.090. Unless a parent stands convicted of a criminal charge stemming from abuse or neglect of a child-which does not describe this case-TPR is prohibited absent the trial court finding a court of competent jurisdiction has previously adjudged the child to be abused or neglected, or finds the child to be abused or neglected in a current proceeding. KRS 625.090(1)(a). Additionally, the trial court must find termination is in the child's best interest. KRS 625.090(1)(c). Finally, the trial court must *656 find existence of one or more grounds enumerated in KRS 625.090(2) demonstrating parental malfeasance or nonfeasance. Here, the trial court made all required findings. We have determined each was supported by clear and convincing proof.
Involuntary TPR is permitted on the finding of a single factor listed in KRS 625.090(2). CHFS alleged three grounds: abandonment ( KRS 625.090(2)(a) ); failure/refusal/inability to provide essential parental care and protection for a period of not less than six months without reasonable expectation of improvement ( KRS 625.090(2)(e) ); and, for reasons other than poverty alone, failure/inability to provide essential food, clothing, shelter, medical care, or education without reasonable expectation of significant improvement in the parent in the immediately foreseeable future ( KRS 625.090(2)(g) ). To order TPR, the trial court had to find substantial clear and convincing evidence supporting one ground; it found support for all three grounds. Father challenges the trial court's findings on each ground.
"Generally, abandonment is demonstrated by facts or circumstances that evince a settled purpose to forego all parental duties and relinquish all parental claims to the child." O.S. v. C.F. , 655 S.W.2d 32, 34 (Ky. App. 1983). Father argues he did not "abandon" his children because he spoke with them on the telephone-while choosing to live in Michigan-in the wake of the court removing the children from his custody due to physical abuse. His position conveniently overlooks his total failure to provide child support, a birthday card, a Christmas toy, a meal, or even stroll with them around a park. Today's cell phones may have infinite functionality but are a poor substitute for a parent. A few phone calls simply do not offset Father visiting with Son and Daughter only twice in the span of a year, paying no child support, and not complying with the offer of reunification services. The trial court did not err in finding Father abandoned his children.
Immediately after admitting in his brief he was noncompliant with the court's orders, Father admits he did not provide his children essential parental care and protection for at least six months but attributed this to living in Michigan. This argument is flawed. First, Father chose to live in Michigan; he was not exiled there. Second, there were times between June 2016-when the children entered state care-and May 2017-when the TPR petitions were filed-that Father was living in Kentucky. During those times he could have had regular contact with Son and Daughter-yet he had only two supervised visits. He also could have brought the children food or provided them toys and clothing while in Kentucky. He did neither. Although Father claims he worked off and on while in Kentucky, he paid nothing toward his children's care. He could have paid child support wherever he was. He paid nothing. Swartz's testimony provided substantial clear and convincing proof Father did not provide his children essential parental care and protection. KRS 625.090(2)(e) was satisfied.
Next, Father challenges the trial court's finding he did not provide essentials necessary for his children's well-being and "there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child[.]" KRS 625.090(2)(g). Father posits this factor does not describe him because he had worked at two jobs in Michigan and had secured housing in Michigan.
We are not privy to Father's work history. We know he was not working at the *657 time of trial. We also know he was not working at the time of the ICPC evaluation which stated no one in the household was working and there were insufficient household funds to support two more children. Father told the ICPC evaluator he had recently interviewed at Buffalo Wild Wings and was hired as a cook but had no start date. There was also reference to Father briefly working in Kentucky when he returned to work his case plan.
The three-bedroom bungalow-style home in Michigan where Father was living with E.E. and her three children, did not provide suitable accommodations for Son and Daughter. They would have shared a bedroom and Father had no beds for them. However, according to the ICPC evaluation, dated February 14, 2017, the housing contract did not allow Father to add tenants or move to a larger unit for at least one year. Father's claims of employment and housing are illusory and lack substance. Swartz's testimony and the written ICPC evaluation support the trial court's finding.
Attacking the "reasonable expectation of" improvement or significant improvement mentioned in KRS 625.090(2)(e) and (g), Father claims he "has taken many steps to improve his ability to parent and protect his children." Tangible proof of such steps, however, is nonexistent. He did not complete the abusive parenting class because he refused to admit he abused Daughter. He completed the nurturing parenting class in Michigan knowing it would not substitute for the abusive parenting class required by the court. Moreover, he did not believe the disciplinary tools he learned during the nurturing parenting class would work with his children, maintaining they only respond to corporal punishment. Realistically, the record shows Father worked some and took some random drug tests, but his children reaped no tangible benefit from either step.
Father argues he was given insufficient time to turn his life around. However, he gives no indication of how long his children should remain in foster care while he tries to transform himself. It appears Father is willing to take steps on his terms, but not on the trial court's terms. Moreover, there was no hint any parenting class, supervised visit, random drug test, work, or telephone calls to the children, caused Father to recognize whipping Daughter with paint sticks wrapped in duct tape constituted abuse. Furthermore, there was no suggestion the passage of more time-unspecified in length-would change Father's view. The trial court's findings of KRS 625.090(2)(a), (e) and (g) are based on substantial clear and convincing evidence. There was no error.
Father's second argument is CHFS failed to make reasonable efforts to reunite his family. This claim stems primarily from the trial court ordering him to complete the abusive parenting class-something he could not do because he admitted using "inappropriate corporal punishment" on Daughter but refused to admit abusing Daughter. He attended two classes, refused to sign an accountability statement, was discharged from the program, and moved to Michigan where he took the nurturing parenting classes knowing they were not a viable substitute for the court-ordered abusive parenting classes. Father argues CHFS had to offer alternatives to him to allow him to comply with the trial court's order. We disagree.
"Reasonable efforts" is "the exercise of ordinary diligence and care by the department to utilize all preventive and reunification services available to the community in accordance with the state plan for Public Law 96-272 which are necessary to enable the child to safely live at home[.]"
*658 KRS 620.020(11) (emphasis added). The trial court found CHFS made appropriate referrals for Father including substance abuse counseling, random drug screens, abusive parenting classes, and supervised visitation. The trial court further found Father did not comply with the services offered. He tested positive for marijuana but failed to complete a required substance abuse assessment. He failed to have regular visitation with his children, participating in only two supervised visits before moving to Michigan.
As previously noted, Father's greatest stumbling block was refusing to accept responsibility for abusing Daughter-a recurring theme in this appeal. Rather than completing the abusive parenting class to which he was referred, he relocated to Michigan and expected CHFS to find alternatives for him in Michigan to satisfy the court's order. As quoted previously, the trial court concluded CHFS was not obligated to offer Father an alternative to the abusive parenting class because he refused to complete Centerstone's requirements. We agree.
An abusive parenting class has a specific structure and specialized goals. It includes both group therapy and one-on-one counseling, unlike the lectures typically given in a nurturing parenting class. An abusive parenting class is designed to help a parent realize his error; recognize the effect his error has on the child; create a plan to ensure the error does not recur; and provide an apology to the child to enable the parent/child relationship to improve. A major factor in the abusive parenting class is the signing of the accountability statement in which the parent accepts responsibility for his error. Father refused to sign the required statement.
CHFS made reasonable efforts to reunite the family. CHFS referred Father to an abusive parenting program recognized by Kentucky. That is the extent of its responsibility under KRS 620.020(11).
The services that will be reasonable, and therefore required, depend on the facts and circumstances of each case. There may be a strong relationship between the definition of reasonable efforts and the court's findings with regard to parental attitude. If parents have made no attempt to comply with reunification plans initially developed by the Cabinet for Health and Family Services, it should not necessarily be incumbent upon the Cabinet to develop additional, proactive services for the family prior to termination of parental rights.
Involuntary termination of parental rights-Reasonable efforts by Cabinet for Health and Family Services, 16 Ky. Prac. Domestic Relations L. § 25:31.
Here, Father failed to complete the abusive parenting class because he refused to admit abusing Daughter. No matter where Father moved, a qualifying abusive parenting program would have the same components and require the same admission. Any "Catch 22" was of Father's own making and there was no reason for CHFS to try to find a nonexistent alternative. We will not require CHFS to become familiar with services offered around the world in the event a parent facing TPR chooses to relocate to another state or country. That would exceed the bounds of "reasonable efforts" and "services available to the community[.]"
According to Swartz, since the filing of the TPR petitions, Father has not fully complied with the court's remedial orders and the court-approved treatment plan. As outlined above, he did not take advantage of services offered and did not sufficiently progress toward completion of the treatment plan to allow safe return of Son and Daughter to his custody. Father's failures prevented CHFS from recommending reunification *659 of the family. It was not clear error for the trial court to find CHFS made reasonable efforts to reunite the family.
Father's last argument urges reconsideration of A.C. to hold there is no statutory right to counsel on appeal of a TPR order unless counsel is compensated. This claim was not presented to the trial court, and palpable error review has not been requested. The claim is not properly before us and we say nothing more about it.
The orders and judgments entered by the Jefferson Circuit Court, Family Division, on March 28, 2017, are AFFIRMED.
ALL CONCUR.

Mother neither answered nor appeared to contest the two TPR petitions. Her parental rights were terminated in the same action. Though named by Father as a party in the notice of appeal, she has not participated in these two appeals which are being heard together.

Swartz succeeded Tamara Sisson as the family's caseworker in August 2016.

According to Swartz, nurturing parenting classes teach participants how to discipline children and work with them. They have no group therapy or individual counseling component and do not train an abusive parent to accept responsibility for his actions.

Kentucky Revised Statutes.

The Housing and Community Development Act of 1974, offers rental assistance to low income individuals. 24 C.F.R. § 982.1. In particular, the Section 8 Housing Choice Voucher program pays the balance of rental payments exceeding thirty percent of a renter's monthly income. E.E. secured a housing voucher in Michigan. When Michigan authorities learned Father was working in Kentucky, he was advised the job jeopardized the voucher and quit working.

ICPC is an interstate agreement under which Michigan's child protection agency acts on Kentucky's behalf to determine whether returning children to Father in Michigan would be in each child's best interest.

A certification of record dated March 6, 2018, indicates the record contains one CD/DVD and 117 pages of written record. A second certification, dated August 21, 2018, indicates the record contains one box of exhibits. The record provided to us is consistent with those figures, but the only recorded testimony we have is from Herzog and Swartz.

Kentucky Rules of Civil Procedure.