RENDERED: MAY 2, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1127-ME

M.F.                                                                    APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
FAMILY COURT DIVISION
v.          HONORABLE TRACI B. BRISLIN, JUDGE
ACTION NO. 23-AD-00185

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; R.J.H.; AND
L.B.H., A MINOR CHILD                                                   APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, EASTON, AND L. JONES, JUDGES.

JONES, L., JUDGE: M.F.[1] (Father) appeals from the judgment of the Fayette Circuit Court, Family Court Division (family court), terminating his parental rights to minor child, L.B.H. (Child). In the same order, the family court also terminated the parental rights of R.J.H. (Mother). Mother has not appealed that judgment. Having fully considered the briefs and the record, we affirm.

I.        **FACTUAL AND PROCEDURAL HISTORY**

Child was born August 31, 2020. Father had no involvement with Child for the first two years of her life. Father suspected he may be Child's father, but paternity was not confirmed until after the Cabinet for Health and Family Services (Cabinet) became involved with Child.

In late July 2022, the Cabinet received a referral regarding abandonment and lack of supervision. It was discovered Mother had left Child in the care of maternal grandmother (Grandmother) since the child's birth. Grandmother had tested positive for cocaine, and Mother could not be located. In September 2022, the Cabinet filed a Dependency, Neglect, or Abuse (DNA) Petition alleging neglect or abuse by Mother and Grandmother. Father was not named in the petition. Father had not taken any steps at the time to obtain custody or confirm paternity of Child.

---

[1] To protect the privacy of the minor child, we will refer to the child and her natural parents by their initials or "Father," "Mother," and "Child" rather than by name.

Following a temporary removal hearing, Child was placed with the Cabinet. The Cabinet placed Child in the care of a maternal aunt, though later Child was placed in a foster home. On October 26, 2022, the family court found Child was neglected or abused, and at a disposition hearing on December 14, 2022, Child was committed to the custody of the Cabinet.

Sometime between Child's removal and February 2023, Father's paternity was established by an at home paternity test. The Cabinet was unable to recommend Father take custody of child: Father had no stable housing at the time and had a positive drug screen. At a hearing on February 15, 2023, Father was ordered to submit to twice-weekly drug screens. Father was also allowed supervised visitation with Child.

The Cabinet offered case plans to both Father and Mother. Those case plans included the following: (1) obtain a psychosocial assessment; (2) remain drug and alcohol free; (3) submit to drug screens; (4) complete a substance abuse assessment and follow through with recommendations; (5) develop and follow a relapse prevention plan; (6) attend alcohol anonymous/narcotics anonymous (AA/NA) classes; and (7) complete parenting classes. Services offered by the Cabinet to parents to help them complete those case plans included making referrals to community partners, paying for the drug screenings, and scheduling a

TAP assessment.[2]  We need not go into detail regarding Mother's progress on her case plan; it is sufficient to say she did not complete it.

At a review hearing on May 4, 2023, Father had only recently begun to drug screen, ostensibly to keep his visitations from being stopped.  Incidentally, several visits had to be cancelled due to Father arriving for those visits apparently intoxicated.  Father tested positive for alcohol and marijuana.  Father had not completed any parenting classes nor obtained a substance abuse assessment.  In late May, Father entered the Walker House for substance abuse treatment.  While the Walker House recommended outpatient treatment, Father left the Walker House but failed to seek any treatment.  Father still did not have stable housing.

The Cabinet continued to have concerns about Father's substance use, particularly alcohol.  On July 19, 2023, after Father apparently appeared in court under the influence of alcohol, the family court ordered Father to submit to a breath test.  The family court suspended Father's visitation with Child until he had tested negative for alcohol for sixty days.  Father was subject to be screened twenty-six times between July 19, 2023, and September 20, 2023.  Father missed twenty-two of those screens.  Of the remaining four screens, Father tested positive for alcohol three times.

---

[2] Targeted Assessment Program.

On September 20, 2023, the family court approved the Cabinet's petition to change the goal from returning Child to her parents to adoption. At that time, Father had not complied with the family court's order to remain drug and alcohol free for sixty days before visitation with Child resumed. Furthermore, Father had not obtained any substance abuse treatment or obtained appropriate housing.

On October 17, 2023, the Cabinet filed a Petition for Termination of Parental Rights (TPR) as to both parents. The matter proceeded to a bench trial on July 10, 2024. Father was present; Mother was not.[3] The Cabinet's sole witness was Teria Slaughter, the on-going social worker for Child prior to the Cabinet's TPR petition. Ms. Slaughter testified how Child came into the Cabinet's care, how Father became involved, the case plans developed for both parents, and both parents' lack of progress regarding those case plans. Ms. Slaughter also testified Father had not visited with Child since before the sixty-day drug screen had been in place and Father had not been in contact with the Cabinet for at least ninety days prior to the TPR hearing. As to Child's financial needs, Ms. Slaughter testified that outside of some gifts, Father had not provided financial support for Child.

---

[3] On January 4, 2024, the family court appointed a warning order attorney to notify Father about the Cabinet's petition to terminate his parental rights. On March 14, 2024, the warning order attorney filed his report indicating that he was unable to inform Father of the TPR petition. Father appeared at the final TPR hearing on July 10, 2024; it is unclear from the record how he was notified of that hearing.

Regarding Child's progress and outlook, Ms. Slaughter testified that Child was doing well in her current placement, was meeting appropriate milestones, and was attached to her foster parents and the other children in the home. Ms. Slaughter also testified that the foster parents were likely to adopt Child. Ms. Slaughter testified that adoption was in Child's best interest as adoption would offer Child stability and consistency in her life.

At the TPR hearing, Father offered his own testimony as well as testimony from Mercedez Ramos (Father's sister) and Bernicia Humber. Both women testified Father had helped with babysitting and caring for their own respective children with no concerns. Both women testified that Father had no alcohol abuse issues; in particular Ms. Ramos testified that as his sister, she would "know" if he did.

Father testified that he worked as a tattoo artist, had obtained an apartment in April 2023, and that he was in the process of completing parenting classes even though he felt he did not need them. Regarding his alcohol use, Father testified that he had obtained a second assessment which stated he no longer needed treatment, but he could not provide documentation of this. Father also admitted he did not attend NA/AA classes as he felt he did not need them, especially as he had to be sober for his job. When asked why he missed most of the drug screens between July and September of 2023, Father replied that his work

schedule interfered with those screens. When questioned by the family court regarding the incident where he submitted to a breath test in court, Father first tried to say that the alcohol in his body was leftover from the weekend, but then admitted to having drank the night before. Father continued to say that he did not have a substance abuse issue and that he would not consume alcohol around Child.

Following the conclusion of testimony, the family court made oral findings on the record, and terminated the parental rights of both parents.[4] This was later reduced to writing. The family court found that, pursuant to Kentucky Revised Statute (KRS) 625.090, Child was an abused or neglected child, and termination of parental rights of both parents was in Child's best interest. The family court also found the following: (1) both parents had abandoned the child for a period of not less than ninety days; (2) both parents had continuously or repeatedly failed to provide, or were substantially incapable of providing essential parental care and protection for the child with no reasonable expectation of improvement; (3) both parents had, for reasons other than poverty alone, continuously or repeatedly failed to provide or were incapable of providing essential food, clothing, shelter, medical care, or education and no reasonable expectation of improvement; and (4) Child had been in foster care under the

---

[4] While the family court was making its oral findings, Father became belligerent and was ordered to leave the courtroom. Father's counsel remained in the courtroom for the remainder of findings.

responsibility of the Cabinet for fifteen cumulative months out of forty-eight months preceding the filing of the TPR petition. Along with its findings, the family court entered a written order terminating the parental rights of both parents. From that order, Father made a timely appeal.

## II.        STANDARD OF REVIEW

KRS 625.090 governs TPR Proceedings. Under that statute, before parental rights may be terminated, the trial court must find by clear and convincing evidence that a tripart test has been satisfied: "(1) the child is found or has been adjudged to be an abused or neglected child as defined in KRS 600.020(1); (2) termination of the parent's rights is in the child's best interests; and (3) at least one of the termination grounds enumerated in [KRS 625.090(2)(a)-(k)] exists." *Cabinet for Health and Fam. Services v. K.H.*, 423 S.W.3d 204, 209 (Ky. 2014).

As observed by a prior panel of this Court in *M.E.C. v. Cabinet for Health and Family Services*, 254 S.W.3d 846, 850 (Ky. App. 2008):

> [A]lthough termination of parental rights is not a criminal matter, it encroaches on the parent's constitutional right to parent his or her child, and therefore, is a procedure that should only be employed when the statutory mandates are clearly met. While the state has a compelling interest to protect its youngest citizens, state intervention into the family with the result of permanently severing the relationship between parent and child must be done with utmost caution.

Even so, "[b]ecause termination decisions are so factually sensitive, appellate courts are generally loathe to reverse them, regardless of the outcome." *D.G.R. v. Cabinet for Health and Fam. Services*, 364 S.W.3d 106, 113 (Ky. 2012). Indeed, "[t]his Court's standard of review in a termination of parental rights action is confined to the clearly erroneous standard in CR 52.01 based upon clear and convincing evidence[.]" *M.P.S. v. Cabinet for Human Resources*, 979 S.W.2d 114, 116 (Ky. App. 1998). In reviewing whether or not the trial court's factual findings are clearly erroneous, this Court looks at "whether or not those findings are supported by substantial evidence." *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). "Substantial evidence" means "[e]vidence that a reasonable mind would accept as adequate to support a conclusion and evidence that, when taken alone or in the light of all the evidence, . . . has sufficient probative value to induce conviction in the minds of reasonable men." *Id.* (internal quotation marks, footnotes, and citations omitted). "[T]he findings of the trial court will not be disturbed unless there exists no substantial evidence in the record to support its findings." *M.P.S.*, 979 S.W.2d at 116. Furthermore, "[t]he trial court has a great deal of discretion in determining whether the child fits within the abused or neglected category and whether the abuse or neglect warrants termination." *Id.*

That being said, the best interest of the child prong of the tripart test is reviewed for abuse of discretion. *D.J.D. v. Cabinet for Health and Fam. Services*,

350 S.W.3d 833, 837 (Ky. App. 2011). "Absent a showing that a decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles, a [trial] court's determination [regarding best interests of the child] will not be an abuse of discretion and will be sustained." *Id.*

## III.     ANALYSIS

Father argues on appeal that the evidence adduced at the TPR hearing does not satisfy any of the elements of KRS 625.090. Further, Father argues that he had established by a preponderance of the evidence under KRS 625.090(5) that Child would not continue to be abused or neglected if returned to him, and the family court should not have terminated his parental rights. We disagree.

### A. Abuse or Neglect

Because Father was not named in the underlying DNA petition, there were no findings of abuse or neglect against him under that petition, the trial court had to make independent findings of abuse or neglect against Father. *See K.H.*, 423 S.W.3d at 210 (holding that in terminating parental rights, the family court must make findings that each parent abused or neglected the child). However, the family court "has a great deal of discretion to determine whether [a] child fits within the abused or neglected category and whether the abuse or neglect warrants termination." *Department for Human Resources v. Moore*, 552 S.W.2d 672, 675 (Ky. App. 1977).

"Abused or neglected child" is defined by KRS 600.020(1). Relevant to this appeal, the family court found that: (1) Father engaged in a pattern of conduct, including but not limited to substance rendering Father incapable of caring for the immediate and ongoing needs of Child (KRS 600.020(1)(a)3.); (2) Father continuously or repeatedly failed or refused to provide essential parental care and protection for the child (KRS 600.020(1)(a)4.); (3) Father abandoned Child (KRS 600.020(1)(a)7.); (4) Father failed to provide Child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's wellbeing when financially able or offered means to do so (KRS 600.020(1)(a)8.); and (5) Father failed to make sufficient progress toward identified goals as set forth in the court-approved case plan to allow for the safe return of Child to Father that resulted in Child remaining committed to the Cabinet and remaining in foster care for fifteen cumulative months out of forty-eight months (KRS 600.020(1)(a)9.).[5]

In his brief, Father argues the evidence adduced at the TPR hearing was not sufficient to show abuse or neglect and that "the only evidence by all accounts, verified by at least two witnesses and not refuted by the [Cabinet], of

---

[5] Most of these specific findings, as well as other findings discussed in this opinion, applied to Mother as well as Father. Because Mother has not appealed, we need only discuss how these findings affected Father.

-11-

[Father's] interaction with his child was that he was loving and nurturing [to] his child prior to the termination of his visitation." We disagree.

We note at the outset that Father is correct that one of the family court's findings regarding abuse or neglect is not supported by substantial evidence. While Child was in a Cabinet foster home at the time of the TPR hearing, it is unclear the exact date Child left the care of her maternal aunt and entered foster care. Examining the record, it appears Child was still in the care of the maternal aunt at least to July 19, 2023. As the TPR hearing happened in July 2024, it is not possible for Child to have been in foster care for "fifteen (15) cumulative months out of forty-eight (48) months[.]" *See* KRS 600.020(1)9.

The family court's other three findings, however, are supported by substantial evidence. Regarding the definition of "abandonment," in *J.H. v. Cabinet for Human Resources*, 704 S.W.2d 661, 663 (Ky. App. 1985), a prior panel of this Court observed:

> *O.S. v. C.F.*, Ky. App., 655 S.W.2d 32, 34 (1983), tells that, "Generally, abandonment is demonstrated by facts or circumstances that evince a settled purpose to forego all parental duties and relinquish all parental claims to the child." In defining "abandoned child" for purposes of a federal statute concerning a serviceman's beneficiary, *Hafley v. McCubbins*, Ky. App., 590 S.W.2d 892, 894 (1979), said:
>
>> [Abandoned] meant neglect and refusal to perform natural and legal obligations to care and support, withholding of parental care,

presence, opportunity to display voluntary affection and neglect to lend support and maintenance . . . It means also the failure to fulfill responsibility of care, training and guidance during the child's formative years. [Citations omitted.]

Abandonment is a matter of intent which may be proved by external facts and circumstances; otherwise, servicemen, prisoners of war, ship captains or persons requiring prolonged hospitalization would be likely candidates to have their parental rights terminated.

The evidence adduced at the TPR hearing supports the trial court's finding that Father abandoned Child. Father's paternity was only established in February 2023, and he took some effort very late and close to the TPR hearing; however, Father's conduct as a whole shows the intent to abandon Child. Father may have provided gifts, but no other financial support. Furthermore, Father waited until very late to obtain housing or take parenting classes.

Most egregious is Father's unwillingness to address the Cabinet's concern, *and the family court's* concern, about his alcohol use. Father continuously downplayed his alcohol use throughout the proceedings before the family court and continues to do so in his brief. He asserts that concerns about his alcohol use were exaggerated, and the requirement that he complete sixty days of clean drug and alcohol screens was too extreme. In fact, albeit arguing about a different prong, Father complains that "[h]is inability to see and interact with his child until he completes [sixty] days of clean drug and alcohol screen [sic] has

-13-

been totally against his will and beyond his ability to control." Appellant's Brief at 6. While Father may bristle against the requirement that he have sixty days of clean drug and alcohol screens before visits, we cannot say the Cabinet's and the family court's concerns were unwarranted. Furthermore, while Father may argue he missed most of the screens due to incompatibility with his work schedule, Father still tested positive for alcohol for *three of the four* screens he actually took. Father was well aware of the requirements to resume visits with Child and chose not to follow them. We also note that once the screening requirement was in place, Father never saw Child again. Thus, there was substantial evidence to support the family court's finding that Father abandoned the child under KRS 600.020(1)(a)7. For the same reasons outlined above, there is also substantial evidence to support the family court's finding that Father's conduct satisfied KRS 600.020(1)(a)3.-4. and KRS 600.020(1)(a)7.-8.

## B. Best Interests of the Child

In determining whether TPR would be in the child's best interests, KRS 625.090(3) provides six factors for the family court to consider:

> (a) Mental illness as defined by KRS 202A.011(9), or an intellectual disability as defined by KRS 202B.010(9) of the parent as certified by a qualified mental health professional, which renders the parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for extended periods of time;

-14-

(b) Acts of abuse or neglect as defined in KRS 600.020(1) toward any child in the family;

(c) If the child has been placed with the cabinet, whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents unless one or more of the circumstances enumerated in KRS 610.127 for not requiring reasonable efforts have been substantiated in a written finding by the District Court;

(d) The efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child;

(e) The physical, emotional, and mental health of the child and the prospects for the improvement of the child's welfare if termination is ordered; and

(f) The payment or the failure to pay a reasonable portion of substitute physical care and maintenance if financially able to do so.

The family court found there was no evidence of mental illness or mental disability, thus KRS 625.090(3)(a) did not apply. As to the other factors, the family court held that (1) there were multiple acts by Father against Child;[6] (2) the Cabinet made or attempted to make all reasonable efforts towards reunification with the child by means of case planning and referrals to appropriate community

---

[6] KRS 625.090(3)(b).

partners;[7] (3) Father failed to make sufficient efforts and adjustments in circumstances, conduct, or conditions to make it in Child's best interests to return home in a reasonable time;[8] (4) Child's needs have been met in Cabinet custody and Child is expected to make continued improvements upon termination of parental rights as Child has developed a bond with the foster parents, was on track developmentally, and Child has continued to grow and flourish;[9] and (5) Father had not provided any financial support to Child since Child entered foster care.[10]

In his brief, Father takes issue with two of the family court's findings, specifically under KRS 625.090(3)(c) as to whether the Cabinet made reasonable efforts towards reunification with Child and under KRS 625.090(3)(d) as to the efforts made by Father to change his circumstances. Father argues that rather than make reasonable efforts to reunite him with Child, the Cabinet instead frustrated any attempt to do so by insisting on the sixty-day "clean test" requirement to resume visitation. Father also asserts that the Cabinet did not make reasonable efforts to facilitate reunification by failing to make a home visit to his apartment. Furthermore, Father touts his recent progress in obtaining housing, progress in

---

[7] KRS 625.090(3)(c).

[8] KRS 625.090(3)(d).

[9] KRS 625.090(3)(e).

[10] KRS 625.090(3)(f).

completing parenting classes, and the opinions of Ms. Ramos and Ms. Humber as weighing in his favor against TPR. We disagree.

In regards to KRS 625.090(3)(c), the Cabinet correctly points out the plain language of the statute which shows the family court should consider reasonable efforts by the Cabinet *prior* to the filing of the TPR petition. Any purported failure of the Cabinet to offer services to Father *after* the TPR petition was filed need not be considered.[11] Ms. Slaughter testified as to the services offered, including making referrals to community partners to complete case plan tasks, paying for substance screens, and scheduling a TAP assessment. The Cabinet also facilitated visitation with Child until Father's alcohol use led to those visits being stopped until completion of sixty-days testing negative for substances. We agree that looking at the facts of this case, these services were reasonable. *See K.M.E. v. Commonwealth*, 565 S.W.3d 648, 658 (Ky. App. 2018) (citations omitted) ("The services that will be reasonable, and therefore required, depend on the facts and circumstances of each case.").

Prior to filing the TPR petition, Father did not attend parenting classes. Father failed to allay the concerns of the Cabinet and the family court about his alcohol use in order to resume visitation. Father's failure to comply with

---

[11] While not argued by either party, we do note further that since the Cabinet had to request a warning order attorney to try to notify Father about the TPR petition, it appears Father himself failed to keep in communication with the Cabinet.

the case plan and take advantage of those services does not require the Cabinet to develop more services prior to seeking a TPR petition. *Id.* Rather than the Cabinet frustrating reunification of Father and Child, Father's own actions led to that result. The Cabinet was not required to develop additional services – or maintain original services – *after* the TPR petition was filed.

Nor do we agree with Father's interpretation of the evidence adduced at trial as to KRS 625.090(3)(d) regarding whether he had made adjustments in his conduct and circumstances such that it would be in Child's best interest to return to his home in a reasonable time, considering the Child's age. While it is commendable Father has obtained stable housing and has taken steps to take parenting classes, we note that all of this effort was undertaken after the TPR petition was filed. In his brief, Father claims he promised at the TPR hearing that "he would willingly do anything the court required, including outpatient treatment, if given time to complete a case plan. He testified that he is ready, willing, and able to care for and have custody of his daughter now." Appellant's Brief at 9.

As the trier of fact, the family court has the right to weigh the testimony of witnesses and believe or not believe such testimony in whole or in part. *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977). It is clear from its findings that the family court did not give much weight to such representations. Furthermore, Father's own actions prior to the filing of the TPR

petition do not show a willingness to follow court orders or complete the case plan. Certainly, Father continues to claim that he does not have any problems with alcohol abuse and downplays any such concerns. The testimony of Ms. Ramos and Ms. Humber paint Father in a good light, but neither woman appeared to understand Father's problems with alcohol. The family court was free to give their testimony little weight as well. Even if we were to disagree with the amount of weight the family court gave to the testimony of Father and his witnesses, our task is not to determine if we would come to a different outcome, but instead to decide whether the family court's findings regarding KRS 625.090(3)(d) were based on substantial evidence.

We further find that substantial evidence supports the family court's findings regarding the remaining factors. When examined together, we find there was substantial evidence to support the family court's conclusion that termination of parental rights was in Child's best interest.

### C. Statutory Factors

Before parental rights can be terminated, at least one of eleven statutory grounds under KRS 625.090(2) must be established by clear and convincing evidence. The family court found four of those grounds existed, namely (1) Father abandoned Child for a period of not less than ninety days (KRS 625.090(2)(a)); (2) for a period of not less than six months, Father continuously or

-19-

repeatedly failed or refused to provide, or has been substantially incapable of providing essential parental care and protection for Child, and there is no reasonable expectation of improvement in parental care and protection, considering the age of the child (KRS 625.090(2)(e)); (3) for reasons other than poverty alone, Father has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for Child's well-being, and there is no reasonable expectation of significant improvement in parental conduct in the immediately foreseeable future considering the age of the child (KRS 625.090(2)(g)); and (4) Child had been in foster care under the responsibility of the Cabinet for fifteen cumulative months out of forty-eight months preceding the filing of the petition to terminate parental rights (KRS 625.090(2)(j)).

As an initial matter, the Cabinet concedes that the family court's finding regarding KRS 625.090(2)(j) was erroneous as Child was not in foster care the requisite amount of time prior to filing the TPR petition. However, we believe the other three statutory factors are present. Father's abandonment of Child has been thoroughly discussed, *supra*. As to the statutory grounds in KRS 625.090(2)(e) and KRS 625.090(2)(g), the evidence adduced at the TPR hearing showed Father was employed and did not provide Child with any financial support, clothing, or medical care other than gifts. Father's alcohol use, and more

-20-

particularly his repeated dismissal of the Cabinet's and the family court's concern of his alcohol use remain barriers to any improvement towards reunification. Thus, we find there is substantial evidence to support the family court's findings regarding those three remaining statutory factors.

### D.  KRS 625.090(5)

KRS 625.090(5) provides that "[i]f the parent proves by a preponderance of the evidence that the child will not continue to be an abused or neglected child as defined in KRS 600.020(1) if returned to the parent the court in its discretion may determine not to terminate parental rights."  Procedurally, this means that "even when a court finds clear and convincing grounds to terminate, the court can still shift from considering that proof and consider whether the parents had established, by a preponderance of the evidence, that the child would not continue to be abused or neglected."  *D.G.R.*, 364 S.W.3d at 112.

The family court found Father had not presented sufficient evidence to show Child would not continue to be abused or neglected if returned and further concluded that it would not exercise discretion to decline to terminate parental rights.  Father asserts "[he] and two independent witnesses on his behalf who the [Cabinet] did not attempt to impeach or contradict testified that there would be no risk of harm if [he] were granted custody."  Appellant's Brief at 9.  In support of that conclusion, Father continues to claim that the Cabinet only presented a single

witness with an "incomplete knowledge of the case [and] unjustified concerns about an alcohol problem." *Id.* Father also asserts that "based on representations made by [Father] that he is willing to go through outpatient treatment, finish parenting classes and if necessary, comply with the 60-day requirement for visitation," he should be allowed to complete the case plan with the TPR stayed.

As noted, *supra*, the family court sat as the trier of fact and it had the authority to judge the credibility and weight of a witness's testimony. It is clear from its findings the family court did not find the representations of Father or of his two other witnesses credible. We find there is substantial evidence to support the trial court's conclusion that Father failed to establish Child would not continue to be abused or neglected if returned to him.

IV.      **CONCLUSION**

While we note Father took some steps towards his case plan, our task is not to determine whether we would reach a different conclusion, but rather whether the family court's decision was supported by substantial evidence. The family court judged the facts on their merits, weighed the credibility of the witnesses, and found the Cabinet established the elements necessary for a finding to terminate parental rights under KRS 625.090. Upon reviewing the record and the briefs submitted by the parties, we are satisfied the family court's judgment is supported by substantial evidence. We view any remaining contentions of error as

moot, unpersuasive, unpreserved, or without merit. Thus, for the foregoing

reasons, the judgment of the Fayette Family Court is affirmed.


ALL CONCUR.


BRIEF FOR APPELLANT:                    BRIEF FOR APPELLEE
                                        COMMONWEALTH OF
Thomas C. Chapuk                        KENTUCKY, CABINET FOR
Lexington, Kentucky                     HEALTH AND FAMILY
                                        SERVICES:

                                        Leslie M. Laupp
                                        Covington, Kentucky